#30048-a-JMK
**2023 S.D. 67**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

MATTHEW ALLAN CARTER,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHERYLE W. GERING
Judge

* * * *

WANDA HOWEY-FOX of
Harmelink & Fox Law Office, P.C.
Yankton, South Dakota                          Attorneys for defendant
                                               and appellant.


MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Solicitor General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.

* * * *

ARGUED
AUGUST 31, 2023
OPINION FILED **12/28/23**

#30048

KERN, Justice

[¶1.] In late December 2020, E.W. disclosed to her mother, Nycole Morkve, that "Daddy Matt," Nycole's then-boyfriend Matthew Carter, had "licked" her "lady parts." While spending the Christmas holiday with her grandmother, Jennifer Morkve, E.W. made a similar disclosure, which Jennifer captured on video. After E.W. began experiencing heavy vaginal discharge and had some blood in her underwear, Nycole took her to the emergency room. During the medical examination, Nycole revealed that E.W. could have experienced sexual abuse. E.W. was tested for sexually transmitted infections with two urine tests as well as throat, vaginal, and anal swabs, which all came back positive for gonorrhea. Detective Joseph Erickson obtained a search warrant to test Carter, who was positive for gonorrhea in his throat.

[¶2.] Carter was taken into custody after an interview with Detective Erickson in which he denied that anything sexually inappropriate had occurred between him and E.W. After Carter called his father from the jail and asked him to retrieve something from the bathroom ceiling in Carter's residence, Detective Erickson conducted a search and discovered several electronic items, including a hard drive with videos of child pornography. A forensic search of Carter's cell phone also revealed search terms and web browsing history related to incest and sexual contact with minors. Carter was charged with and convicted of first-degree rape, in violation of SDCL 22-22-1(1).

[¶3.]    Carter appeals, arguing that the circuit court abused its discretion in certain evidentiary rulings, that his motion for acquittal was improperly denied, and that he was deprived of the effective assistance of counsel.  We affirm.

**Factual and Procedural Background**

[¶4.]    Nycole Morkve met Matthew Carter at work in April 2020.  Their relationship progressed over the summer and Nycole soon began spending time at Carter's residence in Yankton, South Dakota.  Nycole also introduced Carter to E.W., her five-year-old daughter and only child.  Starting in August 2020, Carter would sometimes spend time alone with E.W. while Nycole did his laundry or ran grocery errands.  The relationship ended abruptly in late December of the same year after E.W. disclosed to Nycole that "Daddy Matt" had "licked my girl parts" while they were alone in his room watching Scooby-Doo.  E.W. also made similar allegations involving an unnamed teacher and fellow student at her school.  According to Nycole, E.W. subsequently claimed that she had invented these accusations to avoid school and because "Matt yells at me."  Nevertheless, Nycole broke up with Carter on Christmas Day and ensured that he did not have any further unsupervised contact with E.W.

[¶5.]    Nycole took E.W. to spend the Christmas holiday with Jennifer Morkve, Nycole's mother.  Jennifer and Nycole had recently been estranged for several months because Jennifer disapproved of Nycole's relationship with Carter.  Nycole did not mention any of E.W.'s recent troubling disclosures to Jennifer; however, Jennifer later noticed E.W. bathing a new baby doll in the bathroom sink and rubbing it repeatedly in the vaginal area.  Jennifer asked E.W. why she was

doing this, and E.W. responded that "Matthew had touched her and licked her there." E.W. did not repeat her other allegations involving the teacher or fellow student. Jennifer was "shocked" by this disclosure and got her phone to video E.W.

[¶6.] In the video recording, Jennifer asked E.W. to demonstrate on the doll what Carter had done to her. E.W. put the doll on its back, saying, "He lays me down." She then lifted the doll's dress and mimicked a licking gesture over the doll's vaginal area. Jennifer next asked E.W., "How does it make you feel when he does that?" E.W. responded with a shivering, flinching gesture. Jennifer did not tell Nycole about this exchange when she arrived to pick E.W. up. Jennifer did, however, make a report to Child Protective Services and law enforcement the Monday after the holiday weekend.

[¶7.] Earlier in December, Nycole had noticed that E.W. was experiencing yellow vaginal discharge along with some signs of skin irritation in the genital area. Nycole took E.W. in for a medical examination, but tests for yeast or viral infections came back negative. Not knowing about the potential sexual contact with Carter, the doctors assumed the symptoms were related to poor hygiene. After Christmas, between December 29 and 31, Nycole noticed that E.W. "had a little bit of blood in her underwear." Nycole brought E.W. to the Avera Sacred Heart Hospital Emergency Department (Avera), where E.W. gave a urine sample and the physician swabbed her vagina to collect fluid for testing.

[¶8.] During the medical examination at Avera, Nycole acknowledged that E.W. "had talked about someone licking her." The attending physician and nurse reported this disclosure to law enforcement and referred E.W. to Child's Voice, a

clinic for child abuse victims in Sioux Falls, South Dakota. At Child's Voice, E.W. gave another urine sample and, after she was sedated, medical professionals obtained rectal, vaginal, and throat swabs. In addition to the urine sample from Avera, all of these samples tested positive for gonorrhea.

[¶9.] Detective Erickson of the Yankton Police Department received the reports from both Jennifer and the staff at Avera alleging that Carter had "licked" E.W.'s "girl parts." After interacting with E.W. and Nycole at Avera, Detective Erickson obtained and executed a search warrant authorizing collection of a urine sample and throat swab from Carter. The throat specimen ultimately tested positive for gonorrhea. After being advised of his Miranda rights, Carter voluntarily submitted to an interview with Detective Erickson at the Yankton County Safety Center.

[¶10.] During the interview, Carter made several contradictory statements concerning his relationship with E.W. At first, Carter referred to E.W. as a "monster" and "spoiled brat" but later claimed that he "loved her." Carter also initially denied having gonorrhea. However, after learning of E.W.'s positive test results, he admitted to having several recent sexual partners, including Nycole. Carter suggested that Nycole might have passed the disease on to him and E.W. When Detective Erickson introduced the topic of child sex abusers, Carter expressed disgust, saying, "They're f***ed up, man. . . . [T]hey need help. . . . They need to not be in this world." Throughout the interview, even after being confronted with E.W.'s test results and the allegations against him, Carter repeatedly denied having any inappropriate sexual contact with the child. After prompting, Carter did tell

Detective Erickson that he had "regular" pornography on his Xiaomi cell phone and relinquished the device to law enforcement. Carter was then taken into custody.

[¶11.] While incarcerated, Carter made several calls and sent texts from the jail that were intercepted and recorded. On January 14, 2021, Carter talked with his father over the phone asking him to retrieve "the most important things to me, my gold" from the ceiling above the bathroom toilet at Carter's residence. A few days later, on January 18, Carter urgently repeated this request via both text messages and a phone call: "I need you to do this for me. It's very, very, very f***ing imperative, Dad, Okay? If you love me." These entreaties were of no avail since, after the first call, Detective Erickson had searched Carter's residence and retrieved several electronic items, including a hard drive and mobile storage system found above the bathroom ceiling tiles.[1]

[¶12.] A forensic analysis of the confiscated devices revealed a trove of pornographic content,[2] including three videos which depicted cunnilingus between an adult male and a young child. The Xiaomi cell phone that Carter had given to Detective Erickson also contained search terms related to sexual contact with minors. For example, on December 9, 2020, there was a search for, "Is it possible for an eight-year-old girl to be sexually abused and enjoy it?" That same day, there was an additional search for, "Can a 5-year-old little girl have an orgasm." On

---

1. The record reflects that Carter was on parole and this search was authorized by his parole officer.

2. At trial, the State established that the hard drive and Xiaomi cell phone belonged to Carter. They both contained images of Carter and other personal identifying information.

December 30, the phone had also been used to visit a webpage titled: "Father and daughter making real incest love. Incest porn." Discussing these materials and searches via yet another phone call from the jail, Carter admitted, "I've always loved [incest porn]. . . . Like what does that show? Oh, that shows intent. . . . [L]et it fly in court who cares."

[¶13.]        Carter was initially indicted by a grand jury on one count of sexual contact with a child under sixteen years of age in violation of SDCL 22-22-7. However, in a superseding indictment issued April 6, 2021, Carter was charged with one count of first-degree rape in violation of SDCL 22-22-1(1). This indictment alleged that Carter "performed cunnilingus on E.W., when E.W. was less than thirteen years of age." At his arraignment on April 26, 2021, Carter pled not guilty.

[¶14.]        The State subsequently filed a motion to admit the three child pornography videos as other acts evidence pursuant to SDCL 19-19-404(b) (Rule 404(b)). The State also moved to admit the internet searches and web browsing history as res gestae or, in the alternative, other acts evidence. The circuit court admitted this evidence after concluding that its probative value as to Carter's intent and motive was not substantially outweighed by the risk of unfair prejudice.[3]

[¶15.]        The State also filed a motion to admit E.W.'s separate statements to Nycole and Jennifer under the tender-years hearsay exception in SDCL 19-19-806.1 (Rule 806.1). The circuit court found that these statements were supported by

---

3.    The circuit court limited the State to showing only ten seconds of still photos from each of the three videos. The circuit court also excluded as unduly prejudicial certain internet searches concerning the impregnation of children and related prison sentences.

sufficient indicia of reliability to be admissible. The court also initially determined that E.W. was available to testify, meaning that E.W. would be required to testify at trial before the statements could be admitted. However, at a later competency hearing, the State had the following exchange with E.W.:

> State: Okay. Do you remember something that happened with Matt that you didn't like?
>
> E.W.: He yelled at me.
>
> State: Okay. How did that make you feel?
>
> E.W.: Sad.
>
> State: Okay. Do you remember anything else happening . . . with Matt that you didn't like?
>
> E.W.: Just when he yelled at me.

E.W. also testified that she couldn't remember talking to Nycole, Jennifer, or anyone at Child's Voice "about something that Matt had done to you."

[¶16.] The circuit court found, in light of E.W.'s testimony, that she could not remember the subject matter of the incident and was thus currently unavailable pursuant to SDCL 19-19-804(a)(3) (Rule 804(a)) and SDCL 19-19-806.1(2)(b). Since E.W.'s statements were sufficiently corroborated by other evidence, such as the positive gonorrhea tests and Carter's possession of child pornography videos, the court admitted her statements under the tender-years exception. The court also found that E.W.'s statements to Nycole and Jennifer did not prompt Confrontation Clause concerns under the federal Constitution, even though she was not subject to cross-examination, because these disclosures occurred in nontestimonial settings.

[¶17.]	Before trial, Carter filed a motion in limine to exclude evidence of the gonorrhea tests performed on E.W. As support for his position, Carter pointed to the disclaimer on the Nucleic Acid Amplification Test (NAAT) kit which read: "This report is intended for use in clinical monitoring and management of patients. It is not intended for use in medical-legal applications." The circuit court held an evidentiary hearing, where both sides presented expert testimony as to the reliability of these tests.

[¶18.]	Carter's expert, Dr. Elizabeth Dimitrievich, testified that, when using NAAT, each individual sample would need to be tested multiple times in order to ensure accuracy of results. On cross-examination, Dr. Dimitrievich maintained that collecting and testing two separate samples—for example, the two urine samples in this case—was not sufficient. In her view, only two or more tests of the same sample would suffice. Nevertheless, Dr. Dimitrievich did admit that symptoms consistent with the test result—such as E.W.'s vaginal discharge and skin irritation—would increase the likelihood of reliability.

[¶19.]	The State's first expert, Dr. Nancy Free, supervised the collection of E.W.'s second urine sample. According to Dr. Free, one urine sample was examined using the Aptima 2 test and the other using the Cobas 4800 test, with each test targeting different parts of the genetic material. When asked to respond to Dr. Dimitrievich's concerns, Dr. Free stated:

> [W]e have testing that is targeting two different pieces of the genetic material for a gonorrhea infection. This is the same child with the same infection giving us a urine sample. To think we would have different results within 24 hours would not be expected.

Dr. Free also addressed the NAAT disclaimer, explaining, "I believe that that is there to cover the FDA, since they have not been able to do the trials and reassess in children." The State's second expert, Dr. Felix Roth, testified that collecting and testing two separate urine samples, instead of testing the same specimen twice, would still "minimize the possibility of a false positive."[4]

[¶20.] The circuit court found the tests performed on E.W. to be both relevant and reliable. The court pointed to an article provided by Dr. Dimitrievich, which stated that "no NAAT assays have been cleared [by the FDA] for use in any sample type from prepubertal boys and girls. *Without other options*, most laboratories resort to including disclaimers in NAAT test reports regarding the off-label use of sample types[.]"[5] As a result, the article concluded that off-label use of NAAT tests was "inevitable."[6]

[¶21.] The circuit court also referenced forensic guidelines from the U.S. Department of Justice:

> *Due to low prevalence of STDs in the prepubescent population, and lack of enough large randomized controlled trials for validation*, this [NAAT] testing is not yet approved by the Food and Drug Administration for this population. However, the

---

4. According to Dr. Roth, the Aptima and Cobas tests utilize two different collection devices. Thus, in order to test the same sample twice, a doctor or nurse would have to know that they must distribute the initial specimen among multiple collection devices.

5. Xuan Qin & Ann J. Melvin, *Laboratory Diagnosis of Sexually Transmitted Infections in Cases of Suspected Child Sexual Abuse*, 58 J. CLINICAL MICROBIOLOGY, Feb. 2020, at 5 (alterations in original) (emphasis added).

6. *See id.*

CDC discusses the use of NAAT for this population as indicated in protocol recommendations.[7]

The court concluded that, while "multiple testing is recommended, . . . it can either be multiple tests done on one sample or multiple tests done on more than one sample." In support of this finding, the court cited relevant CDC recommendations: "When a specimen tests positive, the result should be confirmed either by retesting the original specimen *or obtaining another*."[8] Based on this evidence of reliability, the court admitted E.W.'s positive test results and permitted Dr. Roth and Dr. Free to testify at trial.

[¶22.] At the conclusion of a jury trial held January 31 to February 2, 2022, Carter was found guilty of rape in the first degree, in violation of SDCL 22-22-1(1). On April 4, 2022, he was sentenced to 45 years imprisonment, with 25 years suspended upon compliance with numerous terms and conditions.

[¶23.] Carter raises five issues on appeal, which we restate as follows:

1. Whether the circuit court abused its discretion when it allowed the State to publish to the jury three short videos of child pornography.

2. Whether the circuit court abused its discretion when it refused to allow Carter's expert the opportunity to testify as to the reliability of the NAAT testing.

3. Whether the circuit court's decision to admit E.W.'s unsworn statements into evidence was an abuse of discretion and violated Carter's right of confrontation.

---

7. DOJ, A National Protocol for Sexual Abuse Medical Forensic Examinations Pediatric 167 n.227 (2016) (alteration in original) (emphasis added).

8. CDC, *Sexually Transmitted Infections Treatment Guidelines*, 70 Morbidity and Mortality Wkly. Rep., July 23, 2021, at 133 (emphasis added).

4.      Whether the circuit court erred by denying Carter's motion for judgment of acquittal on the grounds of insufficient evidence.

5.      Whether Carter's trial counsel was so ineffective that Carter was denied his due process right to counsel.

**Standard of Review**

[¶24.]      Before analyzing Carter's claims, we take this opportunity to clarify our standard of review for evidentiary determinations. A "trial court's evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion." *Ronan v. Sanford Health*, 2012 S.D. 6, ¶ 8, 809 N.W.2d 834, 836. We have defined abuse of discretion as "discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *State v. Snodgrass*, 2020 S.D. 66, ¶ 25, 951 N.W.2d 792, 802. "To establish reversible error with regards to an evidentiary ruling, 'a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice.'" *State v. Loeschke*, 2022 S.D. 56, ¶ 46, 980 N.W.2d 266, 280 (quoting *State v. Little Long*, 2021 S.D. 38, ¶ 49, 962 N.W.2d 237, 255).

[¶25.]      In describing what constitutes prejudice, this Court has often stated that "[e]rror is prejudicial when, in all probability. . . [it] produced some effect upon the final result." *Little Long*, 2021 S.D. 38, ¶ 49, 962 N.W.2d at 255 (alterations in original); *see also State v. Ortiz-Martinez*, 2023 S.D. 46, ¶ 26, 995 N.W.2d 239, 244–45 (defining prejudice in the context of a mistrial). At the same time, in cases involving the third prong of plain error review, we have referred to prejudice as "a reasonable probability that, but for the error, the result of the proceeding would have been different." *State v. Fifteen Impounded Cats*, 2010 S.D. 50, ¶ 33, 785

N.W.2d 272, 283; *see also Neels v. Dooley*, 2022 S.D. 4, ¶ 16, 969 N.W.2d 729, 735 (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81–82, 124 S. Ct. 2333, 2339, 159 L. Ed. 2d 157 (2004) (noting that prejudice in the context of plain error review is the same standard of prejudice employed in ineffective assistance claims)).

[¶26.]        After a review of our precedent, we conclude that this Court has applied these two formulations of prejudice in an interchangeable and equivalent manner.  For example, in *State v. Loeschke*, we utilized the "all probability [that the error] produced some effect upon the final result" standard and then concluded that, because there was no "reasonable probability that the jury would have reached a different result," the prejudice standard had not been met.  2022 S.D. 56, ¶¶ 46, 48, 980 N.W.2d at 281.  Because this Court has treated both formulations as expressing the same concept of prejudice, we conclude that the "all probability" phrase should be understood as "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *Owens v. Russell*, 2007 S.D. 3, ¶ 9, 726 N.W.2d 610, 615.  In other words, "a probability sufficient to undermine confidence in the outcome." *Id.*

## Analysis

### 1.    *Whether the circuit court abused its discretion when it allowed the State to publish to the jury three short videos of child pornography.*

[¶27.]        SDCL 19-19-404(b) permits the admission of other acts evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See also State v. Medicine Eagle*, 2013 S.D. 60, ¶¶ 16–17, 835 N.W.2d 886, 892.  "All that is prohibited under § 404(b) is that

similar act evidence not be admitted solely to prove character." *State v. Phillips*, 2018 S.D. 2, ¶ 14, 906 N.W.2d 411, 415.  Where evidence of other acts is introduced, the evidence must be sufficient "for a trial court to conclude that a jury could find by a preponderance of the evidence that the other 'act[s] occurred and that the defendant was the actor.'"  *Id.* ¶ 20, 906 N.W.2d at 417 (quoting *Kostel v. Schwartz*, 2008 S.D. 85, ¶ 28, 756 N.W.2d 363, 375).

[¶28.]    Before admitting other acts evidence, a trial court must also consider the record and determine "(1) [w]hether the intended purpose for offering the other acts evidence is relevant to some material issue in the case (factual relevancy); and (2) [w]hether the probative value of the evidence is substantially outweighed by its prejudicial effect (legal relevancy)."  *State v. Steichen*, 1998 S.D. 126, ¶ 18, 588 N.W.2d 870, 874–75.  "Evidence is relevant if: (a) It has any tendency to make a fact more or less probable than it would be without the evidence; and (b) The fact is of consequence in determining the action."  SDCL 19-19-401.  "Upon a trial court's determination that the proffered evidence is relevant, the balance tips emphatically in favor of admission unless the dangers set out in [SDCL 19-19-403] substantially outweigh the probative value" of the evidence.  *State v. Taylor*, 2020 S.D. 48, ¶ 33, 948 N.W.2d 342, 352.

[¶29.]    In cases of sexual assault and abuse, other acts evidence can be probative where there is a nexus of similarity between the uncharged conduct and the alleged criminal offense.  For example, we recently held in *State v. Snodgrass* that "searches and images associated with sexual acts between a stepdad and stepdaughter and the use of a dildo on young girls were probative to common plan,

intent, and motive" where the defendant was charged with several counts of raping his girlfriend's juvenile daughter, including with the use of sex toys. 2020 S.D. 66, ¶¶ 12, 33, 951 N.W.2d at 799, 803. Similarly, in *State v. Thomas*, searches for terms such as "teen," "way too young," "family orgy," and "incest," "were corroborative of [the defendant's] plan and intent to engage in sexual conduct with minors and family members." 2019 S.D. 1, ¶¶ 8, 23, 922 N.W.2d 9, 13, 16.

[¶30.]     Here, the circuit court did not abuse its discretion by admitting the three videos of child pornography found on Carter's hard drive. The court specifically found that the videos, internet searches, and web browsing history, were "all probative of Defendant's motive to commit the alleged offense with which he is charged, namely, that he has a sexual interest in children such as E.W." The court also found these materials "relevant to Defendant's intent, including refuting Defendant's voluntary statement to law enforcement that he did not perform cunnilingus on E.W., and that even hearing about such an act was 'horrible.'" The court determined that "having State witness(es) describing the video scenes to the jury . . . [would] not result in unfair prejudice that substantially outweighs the probative value of the evidence." Additionally, in order to avoid the risk of unfair prejudice, the court limited the length of the videos that could be shown to the jury to ten seconds each.

[¶31.]     Carter argues that "[t]he publication of the videos to the jury had no probative value and only served to inflame the jury against" him. He also objects to the testimony of Division of Criminal Investigation Agent Kendra Russell, a State witness who had performed a forensic examination of Carter's electronic devices.

According to Carter, "[n]either [the searches from his phone] nor the video clips of hardcore pornography had anything to do with the crime for which" he was charged.

[¶32.] Preliminarily, we note that, despite repeated references in the briefing, Carter does not seem to directly challenge the admission of his Xiaomi cell phone search history. However, even if he did, our analysis would remain unchanged since the videos and search histories are both relevant to proving Carter's motive and intent to orally penetrate E.W., a central element of the charged offense. The three videos all depict the exact act Carter was charged with committing: cunnilingus on a juvenile female. Further, the searches for terms such as "can a 5-year-old little girl have an orgasm" and "father and daughter making real incest love" reflect a prurient obsession with penetrating the "lady parts" of a young child such as E.W.

[¶33.] Carter's argument that these parallels are completely irrelevant is unavailing. Because there is such close correlation to the underlying criminal activity, we conclude that the other acts evidence presented here is highly probative of both intent and motive. Carter acknowledged as much during his several ill-advised calls from the jail: "Oh, that shows intent. . . . [L]et it fly in court who cares." In Carter's own words, these videos were "the most important things to me, my gold." He was determined to retrieve them because he knew this evidence would incriminate him by revealing his desire and intent to orally penetrate E.W.

[¶34.] The relevance of this evidence is only strengthened by the testimony of Agent Russell. At trial, she first described her forensic analysis of Carter's electronic devices, laying a necessary foundation for the admission of the child

pornography videos. After presenting Carter's internet search history, Agent Russell described the hard drive videos and explained their file names to the jury. For example, one of the files contained terms such as "pthc," "11 YO," and "pedo." According to Agent Russell, these acronyms stood for "preteen hard-core," "11 years old," and "pedophilia or pedophile," respectively.

[¶35.]     Although Carter submits that this testimony has "little, if any, probative value," we conclude otherwise. The information provided by Agent Russell was integral to presenting the electronic evidence of Carter's motive and intent. Her testimony as to the internet searches and hard drive illustrated Carter's fascination with "incest porn" and "preteen hard-core" videos involving adult males performing cunnilingus on prepubescent females. Highlighting this point, Agent Russell noted that Carter could have changed the video file names if he wanted to. Instead, Carter chose to keep the explicit language, further contradicting his claimed revulsion to child pornography. Agent Russell did not unnecessarily testify "at length, about different types of pornography." Rather, her references to genres such as "PTAP (Pre-Teen Asian Porn)" and "PTSC (Pre-Teen Soft Core)" were direct translations of the title acronyms on Carter's own videos. Agent Russell's testimony thus supplied the jury with necessary context that directly pertained to Carter's motive and intent in searching for and possessing these obscene materials.

[¶36.]     Carter also claims the hard drive and videos might not have been his. He asserts that "no testimony or evidence was provided to establish that those hard drives were [his] property." This statement is contradicted by the record. In its

motion to admit on March 18, 2021, the State provided evidence linking the hard

drive to Carter:

> Subsequent to the interview Defendant asked his father on a recorded jail call to go to his residence and remove some items located in the ceiling of his bathroom. Law enforcement went to the residence and obtained those items which included an external hard drive. Pursuant to a search warrant, the external hard drive was forensically examined. That hard drive contained several videos of an adult male performing oral sex on a prepubescent female. *The hard drive also contains information identifying Defendant as the owner of the hard drive such as his unemployment documents, apartment information and photos.*

(Emphasis added.) At the pre-trial hearing on this motion, Agent Russell further

discussed the personal identifying contents of the hard drive:

> I found numerous image files, depicting Mr. Carter. I also found some text files that looked like he authored. There was a South Dakota unemployment dissolvement text file that he authored. As well as an apartment evacuation notice that he appeared to author with his name.[9]

[¶37.] The State provided the circuit court with ample grounds "to conclude

that a jury could find by a preponderance of the evidence" that the hard drive and

its contents belonged to Carter. *Phillips*, 2018 S.D. 2, ¶ 20, 906 N.W.2d at 417.

Carter's phone calls alone contained strong evidence that the electronic devices

found in his bathroom ceiling were his "gold" and his alone. He stated in a recorded

phone call from the jail that "I've always loved [incest porn]." Coupled with the

---

9. Agent Russell also presented this testimony at trial.

other personal identifying information, the evidence of ownership was more than sufficient for the court to present the videos to the jury for their consideration.[10]

[¶38.]	Finally, Carter argues that the videos, despite their relevance, should be excluded for unfair prejudice: "[The] video clips prejudiced the jury members against Matthew based upon what was on his cellular phone." Importantly, however, "[d]amage to the defendant's position is no basis for exclusion; the harm must come not from prejudice, but from 'unfair' prejudice." *State v. Wright*, 1999 S.D. 50, ¶ 16, 593 N.W.2d 792, 799. "To cause unfair prejudice, the evidence must persuade the jury in an unfair and illegitimate way." *St. John v. Peterson*, 2011 S.D. 58, ¶ 16, 804 N.W.2d 71, 76. While presenting Carter's video recordings and search history to the jury may have been detrimental to his case, such harm does not meet the standard for unfair prejudice. As discussed previously, this evidence is highly probative of Carter's motive and intent to perform cunnilingus on E.W.

[¶39.]	In other cases, such as *Snodgrass*, we have previously held that web searches, histories, and still images related to child pornography, while prejudicial, can be admissible when such evidence is closely related to the charged sexual misconduct and thus probative of criminal motive and intent. *See Snodgrass*, 2020 S.D. 66, ¶¶ 31–34, 951 N.W.2d at 803. We acknowledge that videos of child pornography may be particularly sensitive and inflammatory, especially in cases where they are presented as other acts evidence rather than as an element of the

---

10.	The court properly gave a limiting instruction to the jury in this regard: "Before determining whether to consider this evidence, you must first determine if a preponderance of the evidence established that the defendant committed the other act. You are not required to consider this evidence and whether you do is a matter within your exclusive province."

charged offense.  In such cases, courts must carefully consider whether the probative value of such evidence is substantially outweighed by the danger of unfair prejudice.  However, given the strong probative value of the videos in this case, we cannot say the court abused its discretion in permitting their limited admission.

[¶40.]       Carter's videos are not just similar in kind to the alleged assault on E.W., they are highly relevant to whether Carter intended to, and in fact did, penetrate E.W. as required for first-degree rape.  *See* SDCL 22-22-1(1).  Indeed, one of the video file names includes "5 Y full penetration," which, as explained at trial by Agent Russell, likely refers to sexual penetration of a five-year-old child.  Additionally, Carter's internet searches occurred in December 2020, both shortly before and after E.W. disclosed the assault and began to experience symptoms of gonorrhea.  The probative value of such evidence here is readily apparent given "its proximity to the period of alleged abuse."  *Snodgrass*, 2020 S.D. 66, ¶ 32, 951 N.W.2d at 803.  Although it is unclear when Carter may have viewed the videos—Agent Russell testified that the associated timestamps most likely pertained to the times when they were placed on the hard drive—Carter's possession of the hard drive around the same time as the abuse of E.W. is another temporally significant marker.

[¶41.]       Viewed in totality, the videos provide compelling evidence of Carter's plan, motive, and intent to orally penetrate E.W.  The jury was entitled to consider the videos, especially when an alleged lack of proof of penetration was a central part of Carter's defense.  Additionally, the circuit court mitigated the risk of unfair prejudice by limiting the State to showing only ten-second clips or still photos of the

videos and by culling search terms related to the impregnation of minors. The court

also provided the jury with the following limiting instruction:

> Evidence has been introduced that the defendant committed an act other than that which is now charged. Although evidence of this nature is allowed, it may be used only to show motive or intent. You may not consider it as tending to show in any other respect the defendant's guilt of the offense with which the defendant is charged.

[¶42.] We conclude that the circuit court did not err or abuse its discretion by

permitting the jury to consider Carter's internet search history, his child

pornography videos, and the file names of the videos as explained at trial by Agent

Russell.

### 2. Whether the circuit court abused its discretion when it refused to allow Carter's expert the opportunity to testify as to the reliability of the NAAT testing.

[¶43.] On October 15, 2021, Carter filed a motion in limine, seeking to

exclude evidence of the positive gonorrhea tests performed on E.W. In support of

this motion, Carter's expert, Dr. Dimitrievich, submitted a memo proposing that, for

legal investigations, a positive NAAT result should be confirmed by alternate

testing. The circuit court treated this as a *Daubert* motion challenging the

admissibility of the NAAT testing and held an evidentiary hearing where the

State's experts and Dr. Dimitrievich testified as to the reliability of NAAT testing.

The court determined that E.W.'s NAAT results were relevant, reliable, and

ultimately admissible under *Daubert*. On appeal, it is not clear whether Carter is

directly contesting this finding. His issue statement asks us to hold that the "Trial

Court erred when it refused to allow Matthew's expert the opportunity to testify as

to the reliability of the NAAT testing[.]" However, he also argues that "allowing the

jury to hear[] any testimony regarding [the singular NAAT performed on Carter] was clear error by the Trial Court." We address both issues in turn.

i. *The Testimony of Dr. Dimitrievich*

[¶44.] According to Carter, "the Trial Court refused to allow Matthew's expert to testify as to the validity of testing to ensure the accuracy of the testing." However, Carter does not point to any finding or ruling in the record where the circuit court prohibited Dr. Dimitrievich from testifying at the trial or otherwise. As discussed below, although Carter's challenge to the admissibility of the NAAT results at the *Daubert* hearing was unsuccessful, he was free to proffer Dr. Dimitrievich as a rebuttal expert witness at trial, so long as her proffered testimony could survive a potential *Daubert* challenge by the State if it chose to make one. It is not apparent that any such attempt occurred, and we are unwilling to speculate in the face of an undeveloped record on this point.

[¶45.] We nonetheless make the following limited observations. "Trial courts enjoy broad discretion in ruling on the admissibility of expert opinions." *Garland v. Rossknecht*, 2001 S.D. 42, ¶ 9, 624 N.W.2d 700, 702. Such determinations will not be reversed "absent a clear abuse of discretion." *Id.* It is the responsibility of the appellant to demonstrate that an abuse of discretion has occurred. At the very least, we can say that Carter has not made such a showing on this record.

[¶46.] In cases where we have found that a court abused its discretion in rejecting a defense expert's testimony, there has been a proffer of testimony to rebut the State's theory. *See State v. Huber*, 2010 S.D. 63, 789 N.W.2d 283. There is no such proffer here. Dr. Dimitrievich's involvement appears to have been limited

solely to the memorandum submitted in support of Carter's motion to exclude the evidence of E.W.'s gonorrhea tests and her corresponding testimony offered at the *Daubert* hearing. Nowhere in the record is there any indication that Carter wished to present testimony from Dr. Dimitrievich at trial in order to undermine a State theory or argument. Rather, Carter's strategy regarding Dr. Dimitrievich seems limited to relying on her expert testimony to support his *Daubert* motion to preclude the NAAT results from being admitted at trial. Once that attempt failed, there are no indications of any effort to present her testimony at trial for the jury to consider in weighing the credibility of the State expert witnesses and NAAT results.

[¶47.] Even if we assume (1) that the circuit court did refuse a request by Carter to present Dr. Dimitrievich as an expert witness at trial; and (2) that this refusal was an abuse of discretion, we are still unpersuaded that this hypothetical error would have resulted in prejudice. Dr. Dimitrievich's testimony centered on the disclaimer found on the NAAT results: "This report is intended for use in clinical monitoring and management of patients. It is not intended for use in medical-legal applications." She proposed that a positive NAAT be verified by further testing using a different method on the same sample. However, as noted by the State's experts, this need for additional testing is clarified in the CDC guidelines: "When a specimen tests positive, the result should be confirmed either by retesting the original specimen *or obtaining another*." (Emphasis added.)

[¶48.] E.W. gave two urine samples that were examined using different tests that target separate genetic material. Both methods came back positive for gonorrhea. E.W.'s vaginal, rectal, and oral swabs also tested positive. Moreover,

E.W. was experiencing substantial yellow vaginal discharge. By Dr. Dimitrievich's own admission, such confirmation, in general, adds to the reliability of the initial positive test. The NAAT results were also not the only corroborating evidence that Carter had orally penetrated E.W. We are thus unable to conclude that there is a reasonable probability that if the jury had heard Dr. Dimitrievich's reservations regarding testing protocols it would have reached a different result. *See Loeschke*, 2022 S.D. 56, ¶ 48, 980 N.W.2d at 281.

        *ii.*        *Carter's NAAT Result*

[¶49.]      Carter next claims that "[t]he Trial Court denied Matthew's request to exclude the results of the NAAT test taken from Matthew on December 31, 2021." However, Carter's *Daubert* motion on October 15, 2021, sought only to "determine whether the medical testing that was conducted by the State in this matter for E.W. [ ] the alleged victim, is reliable." The ensuing *Daubert* hearing focused exclusively on the testing performed on E.W. Indeed, the testimony prominently referenced the lack of data on NAAT testing on prepubertal children as opposed to adults. After careful review of the record, we are unable to locate a motion seeking to exclude Carter's throat swab, which tested positive for gonorrhea, or his urine sample. Further, Carter did not object at trial to the admission of the test results and only conducted a cursory cross-examination of the State's witness on this issue. The circuit court was thus given no opportunity to address any arguments Carter might have made as to the exclusion of the evidence. By failing to timely object to the

admission of these test results, Carter forfeited this issue for review on appeal. *See State v. Bryant*, 2020 S.D. 49, ¶ 18, 948 N.W.2d 333, 338.[11]

[¶50.]    "When an issue is not preserved for appeal, this Court is limited to review for plain error." *State v. Robertson*, 2023 S.D. 19, ¶ 18, 990 N.W.2d 96, 101. "To demonstrate plain error, [the appellant] must establish that there was: '(1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* (alterations in original) (quoting *State v. Guziak*, 2021 S.D. 68, ¶ 10, 968 N.W.2d 196, 200).

[¶51.]    On appeal, Carter argues that "allowing the jury to hear[] any testimony" regarding his positive throat swab was erroneous. Carter references the disclaimer on E.W.'s results—"this report is not intended for use in medical-legal applications"—and repeats arguments concerning the supposed need for an additional test on the same specimen. But no such disclaimer is present on Carter's results. As explained at the *Daubert* hearing regarding E.W.'s results, the objections to NAAT largely revolved around the lack of data for prepubertal testing, which is categorically inapplicable to Carter.

[¶52.]    We are unable to discern any error in this situation. Prior to his assault of E.W., Carter admitted in a text exchange that he was buying supplies to "cure the clap." While incarcerated, he also sought treatment for gonorrhea. In the

---

11.    We note that the Supreme Court has differentiated between waiver and forfeiture: "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 1777, 123 L. Ed. 2d 508 (1993) (internal quotations omitted).

face of such confirming evidence of reliability, we conclude that the circuit court did not err by admitting evidence of Carter's positive throat swab.

### iii.    E.W.'s NAAT Results

[¶53.]    Finally, Carter challenges the admission of E.W.'s test results. Based on our review of the record, we find no abuse of discretion. At the *Daubert* hearing, Carter's own witness admitted that symptoms consistent with the test result would, in the case of most infections, increase the presumed reliability of any positive test. The court was also provided with guidelines from the CDC stating that positive NAAT results from children could be confirmed through obtaining and testing another sample. The State's experts testified that these guidelines were followed here since the two urine samples from E.W. were evaluated separately with tests that targeted different genetic material.[12]

[¶54.]    NAAT testing in cases of child sexual abuse has been accepted as sufficiently relevant and reliable in other states. Over a decade ago, the Supreme Court of Kentucky determined that a single NAAT result positive for chlamydia, performed on a pubertal female under the age of twelve, was properly admitted under *Daubert*. *See Smith v. Kentucky*, No. 2008-SC-000786-MR, 2010 WL 1005907 (Ky. Mar. 10, 2010). Even though NAAT had not yet been approved by the FDA for use on females under twelve, the court noted that this was a function of the limited data "due typically to a lack of sexual activity in children that young." *Id.* at *4.

---

12.    Dr. Roth also noted that it would be unusual for the same urine sample to be tested twice since the two tests here used different collection devices.

[¶55.]     Here, we accord the circuit court "considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). "We review a circuit court's decision to admit or deny an expert's testimony under the abuse of discretion standard." *Burley v. Kytec Innovative Sports Equip., Inc.,* 2007 S.D. 82, ¶ 12, 737 N.W.2d 397, 402. Carter fails to meet that standard in this case.

[¶56.]     The initial positive urine sample from E.W. was confirmed by another positive result on a different sample using a different test that targeted different genetic material. Swabs of her throat, vagina, and anus also all tested positive. As stated previously, the CDC guidelines suggesting confirmation through the testing of a new sample were followed here. Additionally, E.W. exhibited other physical symptoms of the underlying disease, such as a vaginal discharge. The circuit court was well within its discretion to admit the evidence that E.W. was infected with gonorrhea.

> ### 3.     *Whether the circuit court's decision to admit E.W.'s unsworn statements into evidence was an abuse of discretion and violated Carter's right of confrontation.*

[¶57.]     Carter next argues that the circuit court violated his constitutional right of confrontation by allowing Nycole and Jennifer to testify as to the hearsay statements of E.W. In his view, once the statements were introduced at trial, he was entitled to cross-examine E.W. Initially, the court had determined that E.W. was available to testify, subject to a competency hearing. After the hearing, however, the court found that E.W. did not remember the subject matter of the case

and was thus unavailable to testify. Determining that E.W.'s statements were admissible under the rules of evidence, the court permitted both Nycole and Jennifer to recount E.W.'s separate disclosures that Carter had "licked" her "lady parts."

[¶58.]     Before addressing Carter's Confrontation Clause arguments, we must first consider whether E.W.'s hearsay statements were properly admitted under the rules of evidence. Pursuant to SDCL 19-19-806.1, statements of a child under the age of thirteen describing incident(s) of sexual abuse are admissible if (1) supported by "sufficient indicia of reliability"; and (2) the child either "[t]estifies at the proceedings" or is "unavailable as a witness." "However, if the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act." SDCL 19-19-806.1. As required by this statute, the circuit court held evidentiary hearings to examine the reliability of E.W.'s statements, at which several individuals, including Jennifer and Nycole, testified. After hearing the testimony, the circuit court found that "[t]he time, content, and circumstances" of E.W.'s statements to Jennifer and Nycole regarding the assault by Carter "provide[d] sufficient indicia of reliability to be admissible."

[¶59.]     "A circuit court's evidentiary rulings are reviewed for an abuse of discretion, including its decision to allow a witness to testify about certain hearsay statements." *State v. Toohey*, 2012 S.D. 51, ¶ 11, 816 N.W.2d 120, 127. The circuit court did not abuse its discretion by finding E.W.'s statements to be reliable. E.W. made similar disclosures separately to both Jennifer and Nycole during a short time period. As to the first disclosure, Nycole, despite E.W.'s purported retraction,

separated E.W. from Carter and then followed up with counseling for her. At the time of the second disclosure, Jennifer was unaware of the first disclosure made to Nycole and did not prompt or suggest the allegation to E.W. We agree with the circuit court that the cell phone video of this exchange "shows E.W. making what appear to be unrehearsed and non-coerced actions and statements."

[¶60.]     Despite these indicia of reliability, E.W. was required to either testify at trial or be declared unavailable in order for her statements to be admissible under Rule 806.1. "A declarant is considered to be unavailable as a witness if the declarant . . . [t]estifies to not remembering the subject matter[.]" SDCL 19-19-804(a)(3). In *Toohey*, we explained in a footnote that, while "memory loss may not render a witness 'unavailable' in the constitutional sense," it can for purposes of Rule 804(a). 2012 S.D. 51, ¶ 16 n.2, 816 N.W.2d at 128 n.2. Rule 804(a) provides an exception to the general bar against hearsay evidence. If a declarant is unavailable, perhaps because of death or physical illness, then certain hearsay statements become admissible. Rule 804(a)(3) clearly states that a declarant is unavailable if they testify to not remembering the subject matter of the case.

[¶61.]     At the competency hearing, E.W. stated that she did not remember telling Jennifer or Nycole about something that Carter had done to her. When asked, "Do you remember anything else happening . . . with Matt that you didn't like?," E.W. responded, "Just when he yelled at me." The circuit court then determined that E.W. was unavailable because she had testified to not remembering the subject matter of the case. We conclude that this ruling was not an abuse of discretion. E.W. was asked multiple questions regarding her

disclosures to Jennifer and Nycole concerning Carter. She repeatedly testified that she could not remember. We also understand her statement, "[j]ust when he yelled at me," to be an indication that she does not remember any other significant instances where Carter did something she "didn't like." The subject matter of this case turns on both E.W.'s disclosures as well as Carter's alleged sexual assault. Since E.W. could not remember either, the court properly held that she was unavailable pursuant to Rule 804(a)(3).

[¶62.]      When a child witness is unavailable to testify and the child's out-of-court statements are offered under Rule 806.1 to describe an act of sexual contact or rape, the statements may only be admitted if there is corroborative evidence of the acts described. The circuit court properly held that such evidence existed. The positive gonorrhea tests and reported symptoms experienced by E.W., Carter's admission that he had gonorrhea, Carter's positive test, and Carter's search terms and pornographic videos all served to substantiate E.W.'s allegations. Additionally, Nycole confirmed that E.W. was sometimes left alone with Carter. During his interview with Detective Erickson, Carter also admitted to watching Scooby-Doo alone with E.W. and volunteered, without specific prompting, that E.W. had asked him right before Christmas 2020 whether he was going to "lick" her "girl parts." Thus, the circuit court did not abuse its discretion in finding E.W.'s hearsay statements to Jennifer and Nycole admissible under Rule 806.1.

[¶63.]      We turn next to Carter's Confrontation Clause concerns. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend.

VI.  According to the Supreme Court, "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Ohio v. Clark*, 576 U.S. 237, 245, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015).  "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id.* (alterations in original) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155, 179 L. Ed. 2d 93 (2011)).  "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.*

[¶64.]      E.W.'s statements to Jennifer and Nycole were quintessentially nontestimonial.  E.W. made these disclosures of her own volition in informal settings, including while washing her doll.  Both Jennifer and Nycole testified that they did not prompt or suggest the allegations to E.W.  It would be illogical to assume that E.W., then five years old, uttered these statements with an eye toward having adults use them in a criminal proceeding against Carter.  In addition, at the time of the disclosures, law enforcement was not yet involved.

[¶65.]      As to Jennifer's recording of E.W. washing her doll, Carter argues that Jennifer must have been contemplating some sort of legal action against Carter when she began videoing, transforming E.W.'s recorded statements into testimonial hearsay.  Jennifer testified at trial that E.W.'s initial statement "really shocked her."  At a pretrial evidentiary hearing, Jennifer also acknowledged that she made the recording in an attempt to preserve E.W.'s contemporaneously given statements for Child Protection Services and law enforcement.  However, the Supreme Court

has indicated that we should consider whether the surrounding "circumstances . . . would lead an *objective witness* reasonably to believe that the statement would be available for use at a later trial." *State v. Richmond*, 2019 S.D. 62, ¶ 28, 935 N.W.2d 792, 800 (emphasis added) (quoting *Crawford v. Washington*, 541 U.S. 36, 52, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177 (2004)). Thus, we must view the situation through the eyes of E.W., the declarant.

[¶66.]    We are unable to conclude that, from E.W.'s perspective, the recording created a testimonial atmosphere. The surrounding informal circumstances and impromptu nature of E.W.'s disclosure strongly support a nontestimonial finding. We are also unpersuaded that Jennifer's subjective private motivations would have affected E.W.'s perception of the situation. However, even if the video itself was testimonial, we can "confidently say, on the whole record, that the constitutional error was harmless beyond a doubt." *Taylor*, 2020 S.D. 48, ¶ 49, 948 N.W.2d at 356 (citation omitted). The video merely recaps the substance of E.W.'s previous independent nontestimonial disclosures to Nycole and Jennifer. Furthermore, as discussed previously, there is substantial corroborating evidence—including multiple positive gonorrhea tests—that E.W. was indeed sexually abused by Carter.

[¶67.]    In conclusion, E.W.'s disclosures do not prompt Confrontation Clause concerns sufficient to require a new trial and are thus admissible under SDCL 19-19-806.1.

***4.  Whether the circuit court erred by denying Carter's motion for judgment of acquittal on the grounds of insufficient evidence.***

[¶68.]  Carter insists that the circuit court "had an absolute obligation" to grant his motion for acquittal.  He claims that "the State did not produce one [ ] scintilla of evidence that would serve to establish beyond a reasonable doubt that Matthew had performed an act of penetration [on] the person of E.W."

[¶69.]  "We review the denial of a motion for acquittal de novo." *State v. Quist*, 2018 S.D. 30, ¶ 13, 910 N.W.2d 900, 904.  "Our task is to determine 'whether the evidence was sufficient to sustain the conviction.'" *State v. Guthmiller*, 2014 S.D. 7, ¶ 21, 843 N.W.2d 364, 371 (quoting *State v. Dowty*, 2013 S.D. 72, ¶ 15, 838 N.W.2d 820, 825).  The central question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

[¶70.]  Penetration is a necessary element of rape in the first degree under SDCL 22-22-1(1).  Sexual penetration is defined as "any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body."  SDCL 22-22-2.  "We have interpreted this definition to mean that evidence of vulvar or labial penetration, however slight, is sufficient to prove penetration of the female genital opening." *Toohey*, 2012 S.D. 51, ¶ 22, 816 N.W.2d at 129.  "Penetration can be inferred from circumstantial evidence and need not be proved by medical evidence." *Id.* (citing *Spurlock v. State*, 675 N.E.2d 312, 315 (Ind. 1996)).

[¶71.]     Here, there is ample evidence for a rational trier of fact to have found beyond a reasonable doubt that Carter orally penetrated E.W. E.W.'s statements to multiple individuals that Carter "licked my lady parts" is an age-appropriate way to describe the act of cunnilingus, which involves oral stimulation of interior vaginal structures. Carter's internet searches and pornographic videos also reveal his interest in sexually penetrating a five-year-old. Finally, the State presented expert testimony that it would have been virtually impossible for E.W. to contract gonorrhea absent penetration.[13] Because the totality of the evidence is more than sufficient to sustain Carter's conviction, we affirm the circuit court's denial of his motion for judgment of acquittal.

### 5. Whether Carter's trial counsel was so ineffective that Carter was denied his due process right to counsel.

[¶72.]     Carter makes a final argument that his attorney at the trial stage should have moved to suppress the hard drive because it was removed from his residence prior to a search warrant being issued. He claims that "[a] review of the record does not reflect that trial counsel made even reasonable efforts to suppress evidence, investigate the allegations or require the State to prove up its case." According to Carter, this failure deprived him of his due process right to effective counsel.

---

13.   The State's experts testified that transferring gonorrhea without penetration would require a hand "dripping" with infected bodily discharge to come into contact with an open wound on E.W. Although gonorrhea can be spread via kissing, this similarly would require some exchange of bodily fluids, and would take a certain period of time to spread from the mouth to the rest of the body.

[¶73.]     "Ineffective-assistance-of-counsel claims are generally not considered on direct appeal.  Rather, such claims are best made by filing a petition for a writ of habeas corpus which, if granted, will result in an evidentiary hearing." *State v. Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d 113, 120 (quoting *State v. Hauge*, 2019 S.D. 45, ¶ 18, 932 N.W.2d 165, 171).  "This is because the record on direct appeal typically does not afford a basis to review the performance of trial counsel." *Id.* Therefore, we have stated that "[a]bsent exceptional circumstances, we will not address an ineffective assistance claim on direct appeal.  We depart from this principle only when trial counsel was so ineffective and counsel's representation so casual as to represent a manifest usurpation of the defendant's constitutional rights." *Id.* ¶ 30, 952 N.W.2d at 120–21 (quoting *State v. Golliher-Weyer*, 2016 S.D. 10, ¶ 8, 875 N.W.2d 28, 31).

[¶74.]     At the time of his arrest and the search of his residence by law enforcement, Carter was on parole for driving under the influence.  Detective Erickson testified that the search was approved by Carter's parole officer.  A search warrant was also obtained prior to forensic analysis of the seized electronic devices.  Although Carter has not refuted the State's claim that the search of his residence was authorized under the terms of his parole agreement, he argues the State should have obtained a search warrant to enter his apartment and seize the hard drive.  However, trial counsel's reasons for not challenging the search of Carter's apartment and seizure of evidence are unknown.  At this stage, we are unable to conclude that a "manifest usurpation" of Carter's constitutional rights has occurred.  The record requires further development in order to permit a merits review.

#30048

Accordingly, we decline to address his ineffective assistance of counsel claims herein.

## Conclusion

[¶75.] We conclude that the circuit court did not abuse its discretion in allowing the State to publish to the jury brief clips of the three child pornography videos on Carter's hard drive. The court did not abuse its discretion or commit reversible error in its rulings on the NAAT testing and related expert testimony. Further, the admission of E.W.'s hearsay statements to Nycole and Jennifer, including the related video recording, was not an abuse of discretion and did not violate the Confrontation Clause. Moreover, based on our review of the record in the light most favorable to the prosecution, there was sufficient evidence to sustain the jury's conclusion that the elements of rape in the first degree were established beyond a reasonable doubt and the circuit court did not err in denying Carter's motion for a judgment of acquittal. Finally, the undeveloped record as to trial counsel's strategy renders Carter's ineffective assistance claim not ripe for adjudication on direct appeal.

[¶76.] Affirmed.

[¶77.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.