#29993-a-JMK
**2024 S.D. 15**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

ADIL ABDULKADIR OSMAN,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE BRADLEY G. ZELL
Retired Judge

\* \* \* \*

KATHERYN DUNN of
Minnehaha County Public
　　Defender's Office
Sioux Falls, South Dakota                    Attorneys for defendant
                                             and appellant.


MARTY J. JACKLEY
Attorney General

JACOB R. DEMPSEY
Assistant Attorney General
Pierre, South Dakota                         Attorneys for plaintiff
                                             and appellee.

\* \* \* \*

ARGUED
APRIL 27, 2023
OPINION FILED **03/13/24**

#29993

KERN, Justice

[¶1.] Adil Osman was identified by two eyewitnesses, through a show-up identification procedure, as the driver of a vehicle that ran into a truck parked on a residential street. Osman was indicted for crimes related to this incident and moved to suppress the testimony and evidence related to the identification. After an evidentiary hearing, the circuit court denied the motion, and a jury later found Osman guilty of driving under the influence and leaving the scene of an accident. Osman appeals the denial of his suppression motion and the admission of alleged hearsay statements during trial. We affirm.

**Factual and Procedural History**

[¶2.] Shortly after midnight on August 5, 2020, Becky and Troy Mielitz were sitting in their house in Sioux Falls when they heard what "sounded like a bomb [go] off in front of the house." Troy opened the door and saw that his truck, a 2001 Ford Ranger, which was parked in front of their house, had been struck by another vehicle and pushed across the street. He noticed that the truck's front tires were up over the curb. There was also a 2001 Mazda Tribute (SUV) sitting in the intersection at the end of the block. The SUV was illuminated by the streetlights in the intersection. Both Becky and Troy stepped out the door to see what had happened.

[¶3.] While Troy went back inside to put on his shoes, Becky ran down the street as she called 911 on her cell phone. She later stated that a man had gotten out of the SUV and was standing near the front passenger side looking at the damage to the vehicle. She was less than a half block from the SUV when the man

-1-

looked up toward Becky and took off running. Becky told the dispatcher that she had "just seen some kid run down the street." Becky described the person as having "dark hair from what [she] could see up the street, like maybe a light-colored shirt." The dispatcher attempted to clarify, asking: "You said it was a white male?" Becky responded, "I don't know; I said you could tell he was wearing like white clothes and maybe a light-colored shirt and pants." Becky used "he" throughout the call.

[¶4.] Troy testified at the suppression hearing that after he heard the sound of the collision, he "flew" to the door and saw his "pickup truck rolling across the street onto the neighbor's lawn and this white SUV limping away" until it stopped at the intersection "a half block down." He could see the driver moving around in the vehicle. He went back in the house to put on his shoes and walked toward the SUV when he saw the "guy" take off down the street. Approximately one or two minutes later, two patrol cars came to the scene, one from the east and one from the west. Becky and Troy described the suspect and told the officers that he took off running east. When asked at the hearing if he could tell if the "individual was a boy or girl at that first look[,]" Troy indicated he knew "[i]t was a guy."

[¶5.] Sergeant Chris Treadway responded to the 911 call, and while enroute, received a call from dispatch with a description of the suspect. Shortly thereafter, he noticed a man walking through a yard who matched the preliminary description from dispatch. The man would not make eye contact with Sergeant Treadway, but Sergeant Treadway did not stop him because he learned that officers had detained a suspect who had been walking in a nearby cemetery.

[¶6.]        Officer Bridget Devlin arrived at the scene and spoke with Troy and Becky about their observations. She indicated that they described the suspect as "a male wearing light-colored clothing." Additionally, Officer Devlin conducted a search of the SUV. The SUV had stalled in the intersection and had sustained substantial front-end damage. After inspecting the vehicle, Officer Devlin found an insurance card and a letter from the South Dakota Department of Motor Vehicles that identified Ayele Adane as the owner of the vehicle, but the address used for the registration was that of Mercato, a liquor and convenience store near West 12th Street.

[¶7.]        Sergeant Treadway, having been advised that the vehicle was registered to Mercato, began driving to the store to obtain information about the vehicle and its driver. On his way to the store, he again saw the man he had first observed while enroute to the accident scene. The individual was now running. By this time, Sergeant Treadway was aware that officers had ruled out the suspect located in the cemetery, so he stopped the man to make contact with him. After Sergeant Treadway made the stop, Osman provided his identification, and Sergeant Treadway noticed that Osman had bloodshot eyes, "smelled heavily of intoxicants," and was "obviously intoxicated." Sergeant Treadway testified that he detained Osman because he was backing away from him as if he were preparing to run and because Sergeant Treadway believed Osman was the driver of the SUV. After searching Osman, Sergeant Treadway found a set of keys with a "Fred the Fixer" key on the ring, but none of them were vehicle keys.

[¶8.] Officer Devlin, who was still at the scene of the crash, informed Becky that officers had detained a suspect nearby and that "[t]he guy that we- - that they stopped like downtown, it's the driver[,]" to which Becky responded, "Oh, thank God." Several minutes after this conversation took place, another officer contacted Officer Devlin and asked if the witnesses would be able to participate in a show-up identification. When asked if she would be able to identify the driver, Becky stated, "Well, I mean I seen him from a distance, but I think so."

[¶9.] About twenty minutes after the incident occurred, Officer Devlin brought Becky and Troy to conduct a show-up identification at the spot where Sergeant Treadway had detained Osman, which Becky estimated was less than a mile from the scene. Becky and Troy stayed in Officer Devlin's vehicle while Osman, in handcuffs, got out of the back of a patrol car. Osman was standing next to several police vehicles, and an officer held his arm while shining a flashlight on and near him. Officer Devlin testified that she told Becky and Troy that the suspect was standing next to an officer. Becky stated, "I think that's him." She asked the officers to turn Osman to the side so that she could see his profile and said, "Yes," confirming that this was the man she saw looking at the damaged car and running from the scene. On the video of the show-up identification, Troy can be heard saying that he initially thought the person might have been a female, but he then agreed that Osman was the person he saw near the car because Osman was wearing the same clothes as the person he saw walking away from the SUV.

[¶10.] Osman was charged by a Minnehaha County grand jury in a four-count indictment alleging he committed the offenses of driving under the influence

-4-

(DUI) in violation of SDCL 32-23-1(2); driving under the influence (.08 percent alcohol) in violation of SDCL 32-23-1(1); leaving the scene of an accident involving an unattended vehicle in violation of SDCL 32-34-4; and open container, broken seal in a motor vehicle in violation of SDCL 35-1-9.1. The State filed a part II information alleging this was Osman's fourth DUI in the last ten years. Osman pleaded not guilty and denied the part II information.

[¶11.] Prior to trial, Osman filed a motion to suppress both Becky and Troy's show-up identifications and any subsequent in-court identifications stemming therefrom. Osman argued that the show-up identification was impermissibly suggestive in violation of his due process rights. The circuit court held an evidentiary hearing on the motion. The parties stipulated to the admission of the 911 call from Becky and a thirty-seven-minute dashboard video from Officer Devlin's vehicle.[1] Osman called Becky, Troy, and Officer Devlin to testify about the incident. Becky testified that she saw the man who got out of the SUV that hit the truck looking at the front passenger side of the vehicle he had been driving. As she started running toward him, he looked up and took off running down the street. Becky estimated she was less than a half block from the man.

[¶12.] Troy testified that when he first opened the door and went outside after the crash, he could see someone in the vehicle. He went back inside to put on shoes while Becky ran outside and called 911. By the time Troy went back outside, he saw the man look at Becky and take off down the street. Troy stated he was not

---

1. The dashboard video footage was not shown during the suppression hearing. The court indicated it did not have the necessary equipment to play it and took the motion under advisement until the court could watch it.

even a quarter of a block away from him. He testified that he knew the person was male when he first saw him. Officers arrived within one or two minutes, and Troy gave them a description of the man he saw running away. Troy testified that he did not see the man's face until the show-up identification, but he did see his clothing. When asked by the circuit court what the suspect was wearing, Troy testified that the suspect was wearing skinny blue jeans and a light-colored T-shirt. Troy acknowledged that he did not see the man's face because he was running away by the time Troy got to the SUV and stated that his identification was based on the suspect's dark hair, body build, and clothing rather than facial recognition.

[¶13.]    The court took the case under advisement and later issued a memorandum opinion and order denying the motion. The court noted that both Becky and Troy saw the suspect under the streetlights in the intersection. Becky observed the suspect twice, once when he was standing by the vehicle and once as he fled the scene. The court noted:

> Becky described the suspect only as a male "kid" who was "possibly Hispanic"[2] and wearing a light-colored shirt with dark hair. Troy testified "the streetlight was right there and I could see the person in the vehicle." Troy indicated he was "not even a quarter block" from Osman when he viewed Osman leaving the scene. Once taken to the location where Osman was being held Troy testified "the person I seen outside of the white vehicle is the person that they had; he was in the same clothes that I saw at the vehicle." "It was the same person with dark hair and the same clothing, yes. That's the only reason why I said that's the person. If it wouldn't have been I wouldn't have said so."

---

2.    It is not clear where the circuit court got the information that Becky indicated the suspect was Hispanic. Counsel for the State noted at oral argument that this information is not in the record.

The court held that the show-up identification was not impermissibly suggestive and, that even if it was, having examined the totality of the circumstances under the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), the identifications made by Troy and Becky were reliable.

[¶14.] At trial, Troy and Becky testified regarding the events on the evening of the crash, and both identified Osman as the person they saw under the streetlight in the intersection by the SUV. Both testified that there was no doubt in their minds that they had identified the correct person.[3]

[¶15.] The State also called Michael Guley, an employee at Mercato, who testified that Osman had been with him at the store on the night in question. He asked Osman to go and get the store keys for him from Adane, who also worked at Mercato. Guley told the jury that a key for the SUV was also on the key ring with the store keys. Osman left the store to retrieve the keys from Adane but never returned. The State next called Adane, who testified that he was employed at Mercato and the SUV was registered to him. Adane testified that he was home sleeping after a long road trip from Atlanta, when Osman came into his home and asked for the store keys. Adane handed the car keys to him.

[¶16.] Sergeant Treadway testified that after the show-up identification, he proceeded to Mercato to find the owner of the vehicle and made contact with Guley.

---

3. Troy was asked on cross-examination about the fact he had originally thought the driver could have been a female. In response, he explained that the person was skinny, had longer hair, and at first glance he "couldn't tell if it was a guy or a girl." He further explained that when he saw the suspect at the show-up identification, he was certain Osman "was the person because that was the dress, clothes, and the person. [He] just got to see a closer vision of it."

During the State's direct examination of Sergeant Treadway, the following exchange occurred:

| | |
|---|---|
| State: | And what did was learn [sic] from Mr. Guley? |
| Defense counsel: | Objection. Hearsay. Calls for hearsay, I should say. |
| The court: | Overruled. |
| State: | What did you learn from him? |
| Sergeant Treadway: | He stated that this person, Adil Osman, was driving the vehicle. |
| Defense counsel: | Objection. Hearsay.[4] |
| The court: | Overruled. |
| State: | You can continue. |
| Sergeant Treadway: | He stated that Adil Osman was driving the vehicle that night, and that he should have a set of keys on him that belonged to the store and he wanted those keys back. He described the keys to me. And stated that it had a large, yellow, rubber Fred the Fixer key on the key ring. And so at that point, I knew that those keys belonged to the store. I asked him if the vehicle key would have been on that key ring, and he stated it would have been. But at that point, they were not when we talked. |

[¶17.] Sergeant Treadway also testified that he spoke on the phone with Adane, who confirmed that the SUV's vehicle key should have been on the same key ring as the store keys. Based on this information, Sergeant Treadway testified that he attempted to find the missing vehicle key by retracing the steps from the scene of the crash, to where he first observed Osman walking, and then to the spot where he

---

4. Outside the presence of the jury, Osman's counsel made a more detailed record of his objection. He argued that the testimony was hearsay and prejudicial because Guley and Adane had already testified and neither said that they observed Osman driving the vehicle.

made contact with Osman and arrested him. Sergeant Treadway testified that he found the key laying on the sidewalk about twenty to thirty feet from where he stopped Osman. He took the key to the impound yard where the SUV had been towed, and the key fit into the door and ignition of the SUV.

[¶18.] On cross-examination, Osman's counsel elicited the following additional testimony:

| | |
|---|---|
| Defense Counsel: | So you went to the Mercatos? |
| Sergeant Treadway: | Yes, ma'am. |
| Defense Counsel: | And that is when you said you spoke with Mr. Guley and Mr. Adane; is that right? |
| Sergeant Treadway: | Yeah. I spoke in person with Mr. Guley and on the phone with Mr. Adane. |
| Defense Counsel: | And your testimony today is that they said Adil was driving? |
| Sergeant Treadway: | Correct. |
| Defense Counsel: | Um, would it surprise you to learn that neither one of them testified today that Adil was driving? |
| Sergeant Treadway: | It would surprise me because they told me that night that he was. |

[¶19.] The State also called Cody Geffre, a forensic chemist from the State Health Lab in Pierre. Geffre testified that he received and tested a sample of Osman's blood, drawn after his arrest, which revealed a blood alcohol content of .210. By using alcohol absorption and elimination rates, Geffre was able to extrapolate the results back to the time of the incident, estimating Osman's blood alcohol content to be .230 at the time he had been driving. In summary, he opined that Osman's blood alcohol content would have been higher than .08 at 12:30 a.m., which was the time of the incident.

[¶20.]     The jury returned a verdict finding Osman guilty of driving under the influence and leaving the scene of an accident involving an unattended vehicle. The jury was deadlocked as to Count 2, driving under the influence (.08 percent alcohol).[5] Osman admitted to a part II information, and the court sentenced him to serve five years in the penitentiary with credit for time previously served.[6]

[¶21.]     Osman appeals, raising two issues:

1.     Whether the circuit court erred when it denied Osman's motion to suppress the show-up identifications and any subsequent identifications.

2.     Whether the circuit court abused its discretion in admitting out of court statements from Michael Guley during Sergeant Treadway's testimony.

### Analysis

***1.     Whether the circuit court erred when it denied Osman's motion to suppress the show-up identifications and any subsequent identifications.***

[¶22.]     "We review 'the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review.'" *State v. Red Cloud*, 2022 S.D. 17, ¶ 21, 972 N.W.2d 517, 525 (citation omitted). We review the circuit court's factual findings under the clearly erroneous standard of review. *Id.* ¶ 21, 972 N.W.2d at 525–26.

---

5.     At the close of the State's case-in-chief, the court granted a motion for a judgment of acquittal on the open container charge, determining, as conceded by the State, that it failed to produce evidence that a bottle of vodka found in the vehicle had a broken seal.

6.     For leaving the scene of an accident involving an unattended vehicle, the court sentenced Osman to serve thirty days in the county jail with credit for thirty days served.

[¶23.]     This Court recently examined the admissibility of a show-up identification resulting from alleged unconstitutional procedures in *Red Cloud*.[7] As we noted in that case, "[a] defendant's due process rights may be violated 'when law enforcement officers use an identification procedure that is both suggestive and unnecessary.'" *Id.* ¶ 22, 972 N.W.2d at 526 (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238–39, 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012)).

[¶24.]     In *Red Cloud*, we outlined a two-step inquiry to determine whether to suppress an identification. First, we examine whether "the identification procedure is both suggestive and unnecessary[.]" *Id.* If the identification procedure is found to be both suggestive and unnecessary, we then analyze the reliability of the identification. *Id.* While a suggestive and unnecessary procedure is improper, suppression is not automatic. "[T]he Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Perry*, 565 U.S. at 239, 132 S. Ct. at 724). Therefore, "[t]he identification should only be suppressed if 'the indicators of a witness'[s] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion[.]'" *Id.* (quoting *Perry*, 565 U.S. at 239, 132 S. Ct. at 725) (second and third alterations in original). We stated that the reasoning behind this policy "is to 'deter law enforcement['s] use of improper

---

7.     Osman's trial was held November 17–18, 2021, before the *Red Cloud* opinion was issued on March 23, 2022.

lineups, showups, and photo arrays in the first place." *Id.* (quoting *Perry*, 565 U.S. at 241, 132 S. Ct. at 726).[8]

[¶25.]     To determine whether a show-up identification must be suppressed because the police conduct resulted in a substantial likelihood of misidentification, we consider the factors identified by the United States Supreme Court in *Neil v. Biggers*. Those factors include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Red Cloud*, 2022 S.D. 17, ¶ 23, 972 N.W.2d at 526 (first alteration in original) (quoting *Biggers*, 409 U.S. at 199–200, 93 S. Ct. at 382).[9]

---

8.     This test takes into account what the United States Supreme Court in *Manson v. Brathwaite* considered to be the relevant interests in deciding whether to suppress an eyewitness identification. 432 U.S. 98, 111, 97 S. Ct. 2243, 2251, 53 L. Ed. 2d 140 (1997). Those interests include problems with eyewitness identification, deterring unnecessarily suggestive procedures by police, and the administration of justice, with reliability being "the linchpin in determining the admissibility of identification testimony" to be weighed against "the corrupting effect of the suggestive identification itself." *Id.* at 112–14, 97 S. Ct. at 2252–53.

9.     In recent years, several states have departed from the *Biggers* factors in favor of according defendants additional due process protections under their state constitutions in light of ongoing research regarding the unreliability of eyewitness testimony. Several states have moved to factors analyzing "system variables" (variables used in the criminal justice system under police control, such as blind administration of identification procedures, composition of lineups and photographic arrays, use of show-ups, and multiple viewings) and "estimator variables" (environmental conditions and personal characteristics such as stress and weapon focus) in determining the admissibility of an eyewitness identification. *See Young v. State*, 374 P.3d 395 (Alaska 2016); *State v. Henderson*, 27 A.3d 872 (N.J. 2011); *State v.*

(continued . . .)

[¶26.]     As we stated in *Red Cloud*, "[s]how-up identifications are inherently suspect: '[t]he practice of showing suspects singly to persons for purposes of identification has been consistently condemned as an affront to the requirements of due process and good police procedure.'" *Id.* ¶ 22, 972 N.W.2d at 526 (second alteration in original) (quoting *State v. Reiman*, 284 N.W.2d 860, 871 (S.D. 1979)). We further noted that other methods of identification, such as a photo line-up, are more reliable and should be used when "reasonably possible to do so." *Id.* ¶ 36, 972 N.W.2d at 529.

[¶27.]     In this case, the witnesses were affirmatively told prior to being asked to identify the suspect that the police had detained the man who had crashed into their pickup. When they arrived at the show-up identification, there were several officers and police vehicles in the area. An officer shone a spotlight on Osman, who had gotten out of a police vehicle in handcuffs. These facts rendered the identification procedure suggestive.[10]

_____

(. . . continued)

> *Lawson*, 291 P.3d 673 (Or. 2012); *State v. Harris*, 191 A.3d 119 (Conn. 2018); *State v. Martinez*, 478 P.3d 880 (N.M. 2020).
>
> Other states have undertaken a more limited revision of the *Biggers* factors, abandoning only the certainty factor in light of research showing its limited accuracy. *See State v. Discola*, 184 A.3d 1177, 1189 (Vt. 2018); *State v. Hunt*, 69 P.3d 571, 575–76 (Kan. 2003); *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991). *But see State v. Roberson*, 935 N.W.2d 813 (Wis. 2019) (overturning *State v. Dubose*, 699 N.W.2d 582 (Wis. 2005) and returning to the stance that due process does not require the suppression of evidence with "sufficient indicia of reliability" based on the *Biggers* factors).

10.     The witnesses in this case made their identifications while they were together in the same police car. Courts have expressed disapproval of allowing co-witnesses to view and discuss the suspect together, as statements

(continued . . .)

[¶28.]    However, "suggestive procedures, without more, do not require a holding that the due process clause has been violated." *Id.* ¶ 24, 972 N.W.2d at 526–27 (quoting *United States v. Hadley*, 671 F.2d 1112, 1115 (8th Cir. 1982)). Osman must establish that the show-up was not only suggestive, but *unnecessarily* or impermissibly suggestive. This is because the rationale of deterring improper identification procedures as discussed in *Perry*, and applied in *Red Cloud*, is not implicated in cases where the show-up was necessary, as there would be no improper police conduct to deter in those situations.

[¶29.]    When examining necessity in *Red Cloud*, we determined that the show-up was unnecessary because a "six-person photo lineup containing Red Cloud's picture was used in a separate investigation just hours after the show-up identification." *Id.* ¶ 25, 972 N.W.2d at 527. Here, there was no alternative identification procedure immediately available. Other courts have stated that the propriety of using necessarily suggestive procedures hinges on whether there was "good reason" to use such procedures. *See Martinez*, 478 P.3d at 899; *Commonwealth v. Austin*, 657 N.E.2d 458, 461 (Mass. 1995). Courts have concluded that show-up identifications were necessary for a variety of reasons.

_____

(. . . continued)
from one witness may have an impact on the memory of the other. *See Henderson*, 27 A.3d at 908 (summarizing research on the impact that co-witnesses may have on memories related to eyewitness identifications and concluding that "[s]tudies show that witness memories can be altered when co-eyewitnesses share information about what they observed"); *United States v. Nolan*, 956 F.3d 71, 81 (2d Cir. 2020) ("Studies have demonstrated that the memories of eyewitnesses are extremely susceptible to contamination by external information, a common source of which is 'cowitness interaction.'" (citation omitted)).

[¶30.] In *State v. Clabaugh*, we held that when a suspect is detained within a reasonably short time after the alleged offense, "it is in the best interests of both the suspect and law officers when an identification takes place immediately[,]" so that if the wrong suspect is apprehended, the suspect can then be freed and police can continue the search. 346 N.W.2d 448, 451–52 (S.D. 1984). Here, it was important to quickly locate the correct suspect because the crimes under investigation were a DUI and leaving an unattended vehicle at the scene of an accident. While the police had the ownership information which led them eventually to Adane and Guley, they had not yet located them or talked to them at the time they located the suspect. By the time they stopped Osman, the police had already detained and released one suspect and were actively looking for the driver, whom they knew had taken off on foot. In *Clabaugh*, the suspect was presented to the witnesses thirty to thirty-five minutes after the crime was committed, a short time frame similar to the one herein. *Id.* at 451. Time was also an important factor in this case because the suspect was in the area having just fled the scene, appeared to be intoxicated, and blood alcohol evidence dissipates with the passage of time.

[¶31.] In *United States v. King*, 148 F.3d 968, 969 (8th Cir. 1998), the Eighth Circuit Court of Appeals reached a similar conclusion. In that case, a woman had her car stolen at gunpoint. Shortly thereafter, the police found a car matching the description being stripped. *Id.* The woman was brought to the scene approximately forty minutes after the theft and identified the vehicle. *Id.* The police then lined up four handcuffed suspects that were found with the vehicle, and the woman

identified three of them as being involved in the theft. *Id.* at 970. The Eighth

Circuit held that:

> Police officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary. "[A]bsent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." Necessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive. Whether such factors cast doubt on the accuracy of a positive identification is an issue for the jury.

*Id.* (alteration in original) (internal citations omitted).

[¶32.]       Importantly, in this case, the show-up identification occurred within

thirty-two minutes of officers arriving on the scene of the crime. This allowed the

police to confirm that the identity of the suspect they had detained matched the

description given and thus end their search for the driver of the vehicle. The short

time span between the crime and the identification, along with the pressing, active

search for the perpetrator, demonstrates that the show-up was not unnecessary and

the police conduct of using a show-up as an identification method was not improper.

[¶33.]       Because we determine that the show-up was not unnecessary under

the circumstances here, an analysis of the *Biggers* factors is not required. The

Eighth Circuit emphasized in *United States v. Scott* that before a court examines

the reliability of an eyewitness identification, the defendant must first show the

procedure used by law enforcement "was both suggestive *and* unnecessary." 831

F.3d 1027, 1033 (8th Cir. 2016) (emphasis added). In that case, the court did not

conduct a reliability determination because there was no showing that the

identification was suggestive and unnecessary. *Id.* In the absence of police misconduct, reliability concerns with the eyewitness testimony should be addressed through the defendant's other rights. As the United States Supreme Court has said,

> When no improper law enforcement activity is involved . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Perry*, 565 U.S. at 233, 132 S. Ct. at 721. Expert testimony may also be used to highlight the pitfalls of eyewitness identifications. *Id.* at 247, 132 S. Ct. at 729.

[¶34.] Because the show-up identification procedure used was not unnecessarily suggestive, the circuit court did not err in denying Osman's motion to suppress.

### 2. Whether the circuit court abused its discretion in admitting out of court statements from Michael Guley during Sergeant Treadway's testimony.

[¶35.] Osman contends that Sergeant Treadway's testimony included inadmissible hearsay which prejudiced his case. "We review evidentiary rulings under our abuse of discretion standard." *State v. Malcolm*, 2023 S.D. 6, ¶ 31, 985 N.W.2d 732, 740. "An abuse of discretion is a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *State v. Hankins*, 2022 S.D. 67, ¶ 21, 982 N.W.2d 21, 30 (quoting *State v. Babcock*, 2020 S.D. 71, ¶ 21, 952 N.W.2d 750, 757). "When hearsay statements are erroneously admitted, 'reversal may not always be necessary.'" *State v. Loeschke*, 2022 S.D. 56,

¶ 46, 980 N.W.2d 266, 280. "To establish reversible error with regards to an evidentiary ruling, 'a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice.'" *State v. Little Long*, 2021 S.D. 38, ¶ 49, 962 N.W.2d 237, 255. "Error is prejudicial when, in all probability, it produced some effect upon the final result[.]" *Loeschke*, 2022 S.D. 56, ¶ 46, 980 N.W.2d at 281. In all probability refers to a "reasonable probability that, but for [the claimed error], the result of the proceeding would have been different." *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (alterations in original). "In other words, 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Owens v. Russell*, 2007 S.D. 3, ¶ 9, 726 N.W.2d 610, 615).

[¶36.] Osman alleges that the circuit court erred by denying his hearsay objection to Sergeant Treadway's testimony that Guley told him Osman was driving the car. The court overruled the objection and later explained outside the jury's presence that the testimony was not hearsay because it was not admitted for the truth of the matter asserted but, rather, was elicited to explain the sequence of events leading to Osman's possession of the key ring. Alternatively, the court noted that the declarants, Guley and Adane, were still under subpoena if Osman wished to call them. The court reasoned that if Osman felt he had suffered any prejudice, it could be remedied by recalling the witnesses for questioning regarding the alleged prior statements.

[¶37.] The State argues that the testimony from Sergeant Treadway that Guley told him that Osman was driving the vehicle was not hearsay because it was

not used for its truth but, rather, was used to establish context as to why he went back to search for the vehicle key.[11]

[¶38.] Hearsay is a statement that: "(1) The declarant does not make while testifying at the current trial or hearing; and (2) A party offers in evidence to prove the truth of the matter asserted in the statement." SDCL 19-19-801(c). Osman argues that the circuit court appeared to be applying SDCL 19-19-801(d)(1) to resolve his hearsay objection when it observed that there was an exception to hearsay when the declarant was available and could testify about the hearsay statements. That rule of evidence provides in relevant part:

> Statements that are not hearsay. A statement that meets the following conditions is not hearsay:
> (1) A declarant-witness's prior statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
>> (A) Is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition; [or]
>> (B) Is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying[.]

SDCL 19-19-801(d).

[¶39.] The State elicited from Sergeant Treadway Guley's statement that Osman was driving. The statement fits within the definition of hearsay because

---

11. Although the State alternatively argues that this evidence was admissible as *res gestae* evidence, such an argument is misplaced. Regardless of whether the *fact* offered as evidence can be construed as *res gestae* (as opposed to Rule 404(b) other act evidence), this determination has no bearing on whether the *nature* of the evidence itself—a declarant's out of court statement offered to prove the truth of the matter asserted—makes it inadmissible.

Guley made the unsworn statement prior to trial and the State offered it to prove that Osman was driving. *See* SDCL 19-19-801(c).[12] Further, the statement does not meet the conditions for exclusion from the definition of hearsay because Guley, who testified prior to Sergeant Treadway, was never asked during his testimony whether he made this statement. Thus, there is no point of reference to determine whether it was consistent or inconsistent such that it would be admissible under either SDCL 19-19-801(d)(1)(A) or (B).[13]

[¶40.] As to the circuit court's determination that Sergeant Treadway's testimony was not hearsay because it was admitted simply as context to explain the sequence of events in his investigation, we do not view Guley's statement to Sergeant Treadway about Osman driving the car as a crucial link in the chain to explain why Sergeant Treadway went back to the scene of the arrest. The portion of Guley's and Adane's testimony that explained why Sergeant Treadway went back to the scene of the arrest centered around the fact that the vehicle key should have been on the same key ring as the store keys. However, when the officers searched

---

12. On cross-examination, presumably to impeach, the defense asked Sergeant Treadway whether Adane had also told him Osman was driving and noted that neither witness had testified about Osman's driving during their testimony. On appeal, Osman does not challenge Sergeant Treadway's statement that Adane told him Osman was driving.

13. As to the circuit court's observation that Osman could recall Guley to question him about this alleged statement in the event he felt that he was prejudiced, we note that it is the State who should have first elicited such testimony from Guley if it intended to follow up on this topic with Sergeant Treadway. More importantly, the fact that the State or Osman could recall Guley and later question him about this statement does not cure the impediments to admitting it under the hearsay exceptions that existed at the time of Sergeant Treadway's testimony.

Osman, they located only the store keys on his person, and the vehicle key was missing. Sergeant Treadway went back to search for the key to the SUV based on this information. The jury could have understood Sergeant Treadway's actions without knowing that Guley told Sergeant Treadway that Osman was driving the vehicle. Therefore, the statement from Guley to Sergeant Treadway that Osman was driving the car was not necessary to show context. The circuit court thus abused its discretion in overruling Osman's hearsay objection.[14]

[¶41.]		Nonetheless, Osman is required to show prejudice by establishing "a reasonable probability" that, but for the error, the jury's verdict would have been different. *See Carter*, 2023 S.D. 67, ¶ 25, 1 N.W.3d at 685. Here, while Sergeant Treadway's hearsay comment was the only testimonial statement that Osman was the driver, there was strong direct and circumstantial evidence of Osman's guilt. "Direct and circumstantial evidence have equal weight. In fact, in some instances circumstantial evidence may be more reliable than direct evidence." *State v. Ahmed*, 2022 S.D. 20, ¶ 23, 973 N.W.2d 217, 223.

[¶42.]		Guley testified that he told Osman to get the store key from Adane, which was on a ring with the key to the vehicle. Adane testified that he gave the keys to Osman. Sergeant Treadway, while enroute to the accident scene, saw Osman, who would not make eye contact with him, walking through a yard wearing clothing that matched the description of the suspect. He later saw Osman running,

---

14.	Even if this testimony could have been deemed contextual, Osman did not propose, and the court did not give, a limiting instruction informing the jury of the proper use of the statement. Although the State argues that the statement was not admitted for the truth of the matter asserted, the jury was not instructed that it could not be considered in this way.

and when Osman was detained by law enforcement, he showed obvious signs of intoxication. Osman had the store keys on him but not the vehicle key. This key was later found by Sergeant Treadway on the ground about twenty feet from the spot where he arrested Osman. From this evidence, the jury could certainly infer that because Adane gave Osman the key to the SUV and the key was found near where Osman was detained, Osman had in fact driven and crashed the vehicle.

[¶43.] Although the circuit court erred by admitting Sergeant Treadway's hearsay testimony, we conclude that there was not a reasonable probability that, but for the admission of this testimony, the result of the proceedings would have been different. *See Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d at 686.

[¶44.] We affirm.

[¶45.] JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, concur.

[¶46.] MYREN, Justice, dissents.

MYREN, Justice (dissenting).

[¶47.] There was a substantial likelihood of misidentification because of an impermissibly suggestive identification procedure, and I respectfully dissent. *See Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 381–82, 34 L. Ed. 2d 401 (1972).

[¶48.] The majority opinion acknowledges the show-up identification was suggestive. Still, it concludes it was necessary "because the suspect was in the area having just fled the scene, appeared to be intoxicated, and blood alcohol evidence dissipates with the passage of time." *Ante* ¶ 30. There is no suggestion in the

record indicating that Troy or Becky would have been unavailable to participate in an identification procedure that was not suggestive. Instead, the real reason for the rushed identification was law enforcement's desire to establish Osman's blood alcohol content as soon as possible. In my opinion, this desire to establish Osman's blood alcohol content does not make it necessary to use a suggestive identification procedure. Additionally, the majority opinion cites *Clabaugh* for its stated proposition that "'it is in the best interests of both the suspect and law officers when an identification takes place immediately[,]' so that if the wrong suspect is apprehended, the suspect can then be freed and police can continue the search." *Ante* ¶ 30 (alteration in original) (quoting *State v. Clabaugh*, 346 N.W.2d 448, 451–52 (S.D. 1984)). This reasoning would apply to every apprehension made by law enforcement, justifying every suggestive identification procedure as "necessary."

[¶49.]	The majority opinion further concludes that even if the show-up was unnecessarily suggestive, it did not create a substantial likelihood of misidentification. I disagree. The witnesses briefly saw the suspect about a half block away, illuminated by a streetlight at night. Troy thought he saw a female, while Becky thought she saw a male. After hearing Becky's account, Troy decided he also saw a male. As the majority notes, Officer Devlin informed Becky that law enforcement stopped the driver, "to which Becky responded, 'Oh, thank God.'" *Ante* ¶ 8. A short time later, Officer Devlin took Becky and Troy to identify the detained man. During the show-up, Becky initially expressed uncertainty in her identification (she told law enforcement, "I think that's him."). She then confirmed her identification of the handcuffed suspect, who was being spotlighted for her by an

officer's flashlight. After assessing these circumstances and utilizing the *Biggers* factors, I would conclude that the impermissibly suggestive and unnecessary identification procedure created a substantial likelihood of misidentification. Unsurprisingly, Becky and Troy expressed no uncertainty when they identified Osman to the jury fifteen months later. This was the consequence of an impermissibly suggestive identification process. I respectfully dissent.