#31148-a-MES
**2026 S.D. 28**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

STATE OF SOUTH DAKOTA,                           Plaintiff and Appellee,

    v.

TELL LOGAN CADOTTE,                              Defendant and Appellant.

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

THE HONORABLE ROBERT GUSINSKY
Judge

MATTHEW R. MIRABELLA of
South Dakota Office of
    Indigent Legal Services
Sioux Falls, South Dakota                        Attorneys for defendant and
                                             appellant.


MARTY J. JACKLEY
Attorney General

ROBERTO NOLASCO-CRUZ
Legal Intern

SARAH THORNE
Deputy Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                             Attorneys for plaintiff and
                                             appellee.

ARGUED
APRIL 21, 2026
OPINION FILED **05/13/26**

#31148

SALTER, Justice

[¶1.]          A jury found Tell Cadotte guilty on nine counts of first-degree rape and one count of sexual contact with a person under the age of sixteen.  Cadotte now appeals, arguing that the circuit court failed to provide him with a reasonable remedy to correct an alleged discovery violation and that the court admitted prejudicial hearsay over defense counsel's objection.  We affirm.

## Factual and Procedural History

[¶2.]          On January 27, 2021, Tina Cadotte picked up A.R., her eight-year-old daughter, from school in Rapid City.  Once at home, Tina and A.R. went to the bathroom to wash "the school germs" off their hands.  While A.R. was washing, she told her mother that Tell Cadotte, A.R.'s thirty-year-old half-brother, "was weird."  She explained that Cadotte "would do weird things" to her whenever he babysat.  In explaining to her mother what "weird things" Cadotte had done, A.R. disclosed details of sexual abuse that spanned two years.

[¶3.]          That same evening, A.R. accompanied her parents to the Public Safety Building to report the abuse to the police.  Two days later, A.R. sat for a forensic interview with a trained forensic interviewer at the Child Advocacy Center.  During this interview, A.R. drew four sexually explicit pictures, two of which depicted sex acts that Cadotte made her perform.  She also referred to having seen a video of these sexual acts on Cadotte's cell phone.

[¶4.]          Based on the information A.R. disclosed during her forensic interview, Detective Seth Walker with the Rapid City Police Department sought and received a warrant to search Cadotte's residence for electronic devices that could contain

child pornography. Though home when the officers arrived to execute the warrant, Cadotte did not respond to the officers' knock-and-announce efforts. The officers ultimately forced entry into Cadotte's home, where they found him in the basement and in close proximity to two laptop computers that were running encryption software and a program called "Eraser," which shreds electronic files.

[¶5.] In addition to the two laptops, officers seized ten other electronic devices, including phones and flash drives. These devices were turned over to the Internet Crimes Against Children (ICAC) task force for forensic examination. Despite the efforts to encrypt or erase electronic data, the ICAC examiner recovered more than 300 photos and/or videos depicting child pornography from the laptops. The remaining electronic devices were either too broken to examine or were fully encrypted, or they did not contain contraband images.

[¶6.] Detective Walker later met with the ICAC examiner to review the recovered photos. Of all the images reviewed, forty-one of them were identified as depicting the same child victim. Several of these photos showed a young female child performing fellatio on an adult man. In each photo the child's eyes were covered using a hat, sleep mask, blindfold, or a piece of fabric. The photos were taken from a side profile near the male's waist, so none of the images exposed the male subject's face. In some of the photos, however, Detective Walker recognized a distinctive "white belt with plaid designs." The belt stood out to Detective Walker because, in his words, "it was the same belt that [he] saw hanging in Tell Cadotte's closet" depicted in one of the photographs taken during the search warrant execution.

[¶7.]     Detective Walker met with Tina and showed her sanitized copies of the photos depicting the single child victim "to try and get a positive identification on the young female in the photos and to attempt to locate any other evidence to corroborate where and who may have taken those photos."[1]  Detective Walker's report of the interview indicates that Tina "reviewed all of the images and found 23 different pictures involving [A.R.], [A.R.'s] clothing, or household items that belonged to her family . . . ."  The report also identifies specific items that Tina recognized, including "a white and blue night gown, pink fuzzy pillow, sleep masks, Peppa Pig hat, black/white blanket, yellow shirt, Hello Kitty blanket, pink pajamas with black sleeves, and a gold mirror."

[¶8.]     A couple days after Detective Walker's meeting with Tina, the circuit court authorized a second search warrant for Cadotte's residence; this time to search for the belt and other items in the sanitized photographs that Tina had recognized.  Officers were unable to locate and collect the white plaid belt, but they did collect other items that appeared in some of the photos, such as blankets, leopard print towels, sleep masks, and a hat.

[¶9.]     That same day, Cadotte was arrested pursuant to a complaint that alleged first-degree rape, among other charges.  On March 17, 2021, a Pennington County grand jury returned a thirteen-count indictment charging Cadotte with twelve counts of first-degree rape in violation of SDCL 22-22-1(1) and one count of sexual contact with a child under the age of sixteen in violation of SDCL 22-22-7.

---

1.     At trial, the State described a sanitized photograph as a picture that contains child pornography, but the sexually explicit content has been blacked out.

#31148

[¶10.]        Each of the rape counts contained identical allegations of sexual penetration upon A.R. "on or between the 1st day of September, 2016, through the 31st of August 2020, inclusive[.]"  The sexual contact count alleged an act of sexual contact with A.R. "on or about the 26th day of January, 2021," and related to an allegation that Cadotte forced her to masturbate him while he was driving her to her grandfather's house.

[¶11.]        Cadotte pled not guilty, and the case remained pending for four years, largely due to a related federal prosecution arising from the contraband images found on his laptop computers.  Cadotte eventually pled guilty to possessing child pornography in violation of 18 U.S.C. § 2252(a)(2)(A), and a federal district court judge sentenced him to twenty years' imprisonment, all prior to the state court rape trial, which began in March 2025.

[¶12.]        Before beginning testimony, defense counsel asked the circuit court to make a record of what it claimed was undisclosed evidence.[2]  Once on the record, defense counsel explained that upon entering the courtroom that morning, she learned of a binder containing approximately seventy sanitized images that were not provided to her earlier.  Because the State intended "to ask a witness about several" of those images, she believed the State "had a responsibility to provide [them] to [her] and did not."  This was an apparent reference to the sanitized photographs Detective Walker had shown Tina in an effort to identify A.R.

[¶13.]        Defense counsel acknowledged that she had access to and in fact viewed the unsanitized versions of the photographs at the ICAC facility, but she

_____

2.    Counsel on appeal is different from Cadotte's attorney at trial.

-4-

clarified that she was not provided the "specific photographs that [Detective] Walker sanitized and showed [Tina] until this morning." Defense counsel further stated, "I did go to ICAC and I was told and provided the sanitized images that were shown to Tina Cadotte, I was given four." However, given the binder, defense counsel now understood the number of sanitized photographs to be more than the four that had previously been shared with her.[3]

[¶14.] The State explained that the binder of photos had "been sitting in an evidence locker throughout the pendency of this case and as both parties are aware, if we have an item that is in an evidence locker, both parties have ready access to go to the evidence department and check it out and view the items." Because both parties had access to the binder in the evidence locker, the State posited that it did not need to "take the extra step to go to the evidence department, check out the images, and make copies of them to present to the defense." When asked whether she had the ability to view the binder in the evidence locker, defense counsel responded, "I believe that I did. I just simply didn't know that they were there . . . ."

[¶15.] When the circuit court asked defense counsel "[u]nder what theory do you believe the State needed to provide" them, counsel did not articulate a specific legal basis, relying instead on a generic assertion of unfairness:

> [T]he idea that the State is going to provide me with hundreds of
> photographs and then exclude 70 and knowing that there's all

---

3. In a report recapping his interview with Tina, Detective Walker wrote that he showed Tina "censored images" of child pornography believed to be produced by Cadotte and that Tina had "reviewed all of the images and found 23 different pictures involving [A.R.]" Detective Walker also included this same statement in his affidavit in support of his request for the second search warrant. Both documents were shared with defense counsel through discovery.

these other images out there that I'm not allowed to have, assume that I'm going to know and track down every image, I think it's – – I think it's hiding the ball, quite frankly, Your Honor . . . .

[¶16.] Defense counsel also did not request a specific remedy for the alleged violation. In the absence of a more detailed request, the circuit court construed the defense's argument as an oral motion in limine:

So based on the [c]ourt's understanding, these images were available for the defense to look at so to the extent that you're filing a motion or you're making an oral motion in limine to keep those sanitized photos out, it is denied.

[¶17.] During trial, A.R. testified that Cadotte often babysat her when she was between the ages of six and eight years old. She testified that Cadotte used these occasions to rape her. When asked what rape means, A.R. defined it as "sexual contact without someone's will."

[¶18.] The State then asked A.R. to described specific "things [Cadotte] would do with you." A.R. testified that Cadotte would touch her with his hand and penis. A.R. explained that Cadotte would position her face down on a couch and rub his penis against her butt and put warm "white stuff" in her "butt crack." When asked whether Cadotte's "penis ever [went] inside of your anus," A.R. responded, "No."

[¶19.] A.R. testified that Cadotte would place his penis in her mouth and make her suck on it. She described how Cadotte would always cover her eyes with a blindfold, scarf, or sleeping mask before inserting his penis into her mouth. A.R. recalled that on at least one occasion, Cadotte spread liquid candy on his penis before forcing her to perform fellatio. Although A.R. could not remember exactly how many times Cadotte made her perform fellatio on him, she testified, "I know

-6-

more than 10 times." A.R. also recounted her belief that Cadotte would take pictures while he was abusing her because she could hear the shutter sound of a camera phone.

[¶20.] A.R. further testified that Cadotte would make her rub his penis with her hands. During her testimony, A.R. described a specific time when Cadotte was driving her to her grandfather's house because her dad was fixing a car there. While in the car, Cadotte made A.R. "grab his penis and go make [her] hands go back and forth."

[¶21.] Towards the end of its direct examination of A.R., the State asked her about the four drawings she had made while being interviewed at the Child Advocacy Center.[4] The pictures were admitted as Exhibits 1–4. A.R. described the contents of Exhibit 1 as Cadotte standing with his penis out. Exhibit 2 depicts A.R.'s attempt at drawing the abuse that occurred in the car. A.R. could not recall the specific content of Exhibit 3, but she testified that Exhibit 4 shows a "time when I was sitting in a chair and he was making me suck his penis."

[¶22.] The State questioned Tina, A.R.'s mother, about her interview with Detective Walker. Tina testified that she met with Detective Walker to review

---

4. The forensic interview, itself, was not admitted into evidence. The circuit court excluded the hearsay statements in a pretrial order after finding that the statements did not provide sufficient indicia of reliability under SDCL 19-19-806.1 as a result of certain questions asked by the forensic interviewer. The State petitioned for intermediate review, which we denied by order. The forensic interviewer did testify at trial, however, and provided general testimony about the procedure and protocol for conducting forensic interviews and the process by which children may disclose abuse. A.R. authenticated her drawings from the forensic interview, and they were received without objection during her testimony.

sanitized photographs to try and identify A.R. Though Tina could not recall exactly how many photographs she reviewed, she testified that it was more than twenty. Tina testified that she could not identify A.R. in all of the photos, but she could in some. And when asked whether she believed "that [A.R.] was in those photos," Tina testified, "Yes."

[¶23.]	The State asked Tina whether she would recognize those photos, and she responded, "I should be able to, yes." The State then showed Tina sanitized photographs that had been marked as Exhibits 5 through 18. Tina testified that she recognized Exhibits 6, 15, 16, 17, and 18 as photos that Detective Walker had shown her, but not the others. The State offered and the circuit court received those five exhibits into evidence. The court granted defense counsel's request for a standing objection to the admission of those five exhibits based on the record it made earlier that morning about the State not disclosing them. The exhibits that Tina did not recognize—Exhibits 5, 7, 8, 9, 10, 11, 12, 13, and 14—were never offered or received into evidence.

[¶24.]	With respect to Exhibit 16, the State asked Tina, "Do you know who the individual wearing the blindfold is in that photo?" Tina responded, "It looks like [A.R.]" When asked why she thought that, Tina stated, "With the long hair. I can't really tell." After showing Tina Exhibits 15, 17, and 18, the State again asked, "In those photographs that I've just showed you, were those [A.R.]?" Tina answered, "They look like [A.R.] with long hair." And on redirect examination, Tina further explained: "I mean, even these photos, you know, I don't know if that's [A.R.] It

looks like A.R. It's got the cap where she has a cap on, she's got the long hair, but everything's blocked out."

[¶25.] Detective Walker also testified about his interview with Tina. When asked why he showed Tina the photos, Detective Walker stated, "I was showing her those photos to try and get a positive identification on the young female in the photos and to attempt to locate any other evidence to corroborate where and who may have taken those photos." The State then asked, "And was Tina able to identify photos that she believed [A.R.] was present in?" The circuit court overruled a hearsay objection by defense counsel, and Detective Walker responded, "Yes, ma'am."

[¶26.] The jury also heard testimony from Hollie Strand, the ICAC forensic examiner. Strand testified about the electronic devices that law enforcement recovered from Cadotte's residence and the process she used to search those devices for child pornography. Strand testified that of the more than 300 photos and videos recovered from the devices, she identified forty-one photos that featured the same child. Of those forty-one images, Strand testified that she was able to isolate nine photos that depicted nine separate instances of abuse. These images, Strand opined, had not been downloaded from an external source, but, rather, had been produced by someone with access to the laptop devices.

[¶27.] The State then introduced those nine photographs as Exhibits 28–36 without any objection from defense counsel. And from what is available in the record, it appears that each of the nine exhibits are unsanitized depictions of oral penetration of a blindfolded female child by an adult male. The State took Strand

through each photo and had her identify which characteristics led her to conclude that each photo depicted a separate instance of rape.

[¶28.]     Following the State's case-in-chief, defense counsel moved for judgment of acquittal on all counts. Defense counsel's argument paid particular attention to counts ten, eleven, and twelve. The twelve counts as set forth in the indictment originally correlated with Strand's grand jury testimony about there being twelve photos depicting twelve distinct instances of first-degree rape. But after additional investigation following her grand jury testimony, Strand determined that one of the twelve photos was not a separate occurrence—it corresponded to an existing instance—and two other photos did not involve A.R. at all. Strand's testimony at trial reflected her corrected view.

[¶29.]     Defense counsel thus argued there was insufficient evidence to support counts ten through twelve. The State disagreed and pointed to A.R.'s testimony about it happening "more than ten times" as enough evidence to support a guilty verdict on all twelve counts of first-degree rape. The circuit court agreed that more than ten could certainly support count eleven, but the court astutely recognized the attenuation problem that A.R.'s "more than ten times" testimony presents, e.g., more than ten could mean eleven, but it could also mean twenty. So the circuit court denied the defendant's motion on counts one through eleven, but it granted judgment of acquittal on count twelve, finding there was insufficient evidence for a reasonable juror to find Cadotte guilty of a twelfth count of first-degree rape.

[¶30.]     The jury returned a guilty verdict on nine of the eleven counts of first-degree rape and on one count of sexual contact with a person under the age of

sixteen.  The circuit court sentenced Cadotte to seventy years' imprisonment for the nine counts of first-degree rape and ten years' imprisonment for the one count of sexual contact with a person under the age of sixteen.  The court ordered the two state sentences to run concurrent with one another but consecutive to Cadotte's federal sentence.

[¶31.]       Cadotte appeals, raising the following two issues, which we have restated:

> 1.       Whether the circuit court erred when it denied Cadotte's motion to exclude sanitized photographs under the theory the State had committed a discovery violation.
>
> 2.       Whether the circuit court abused its discretion when it overruled Cadotte's hearsay objection and admitted testimony from Detective Walker about his interview of Tina Cadotte.

**Analysis and Decision**

*Discovery violation*

[¶32.]       "The purpose of discovery statutes and pretrial orders requiring parties to disclose the exhibits they intend to utilize at trial is to 'eliminate trial by ambush.'" *Fiechtner v. Am. W. Ins.*, 2025 S.D. 60, ¶ 80, 27 N.W.3d 746, 768 (quoting *City of Sioux Falls v. Missouri Basin Mun. Power Agency*, 2004 S.D. 14, ¶ 16, 675 N.W.2d 739, 744).  "South Dakota's rules of criminal procedure require a prosecuting attorney to make available for inspection all its discovery upon a defendant's written request."  *State v. Richard*, 2023 S.D. 71, ¶ 34, 1 N.W.3d 654, 662 (citing SDCL 23A-13-3 to -4).

> Upon written request of the defendant, the prosecuting attorney shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, . . . or

> copies or portions thereof, which are within the possession, custody, or control of the prosecuting attorney and which are material to the preparation of his defense or intended for use by the prosecuting attorney as evidence in chief at the trial, or were obtained from or belong to the defendant.

SDCL 23A-13-3.

[¶33.] Cadotte's argument on appeal presumes the existence of a discovery violation and challenges the adequacy of the circuit court's remedial efforts. But this premise is not sound, as the record reveals. When questioned by the circuit court, defense counsel did not identify a legal basis for her objection after learning of the existence of other sanitized images shortly before the trial began. In an apparent effort to frame its ruling, the court merely stated, "to the extent that you're . . . making an oral motion in limine to keep those sanitized photos out, it is denied."

[¶34.] Insofar as Cadotte's brief relies on any authority in the record as a source of the State's obligation to have provided defense counsel with a copy of the binder, he cites an unresolved discovery motion that defense counsel filed three years before trial. The motion sought an order from the circuit court that would have required the State to:

> (1) "provide the defendant the following items, . . . [a]ll recordings, reports, books, papers, documents, [and] photographs . . . known to the prosecution, which are material to the defense, or which the prosecutor intends to offer in evidence at trial"; and

> (2) "to specify any and all tangible, physical and/or demonstrative evidence, including any and all pictures, photographs, or slides, the State intends to attempt to introduce as evidence or use for demonstrative purposes at trial in this case."

[¶35.] Of course, SDCL 23A-13-3's discovery obligations do not hinge on a court order. But they also are not as broad as Cadotte's motion was. For example, defense counsel's motion requests an order "requiring the State's Attorney *to provide to the defendant* the following items . . . ." (Emphasis added.) However, to meet its obligation under SDCL 23A-13-3, the prosecuting attorney simply must "*permit* the defendant *to inspect and copy or photograph*" the enumerated categories of items. (Emphasis added.)

[¶36.] Additionally, defense counsel's motion sought an order requiring the State to "specify any and all . . . evidence, including any and all pictures . . . the State intends to attempt to introduce as evidence or use for demonstrative purposes at trial." But neither SDCL 23A-13-3 nor any other rule under chapter 23A-13 requires the State to specify what evidence it intends to introduce or use as a demonstrative at trial. Therefore, under the circumstances, we must review Cadotte's predicate claim of a discovery violation under the standards set forth in SDCL 23A-13-3, not his unresolved discovery motion.

[¶37.] Here, the State complied with SDCL 23A-13-3's requirements. As it relates to the nine photos that Cadotte argues prejudiced the outcome of his trial, those nine photos were all *unsanitized* and appear to be distinct from the binder of sanitized photos that defense counsel described. Defense counsel acknowledged before the circuit court that she had access to the unsanitized photographs and had reviewed all of them at the ICAC facility. Although the text of SDCL 23A-13-3 would ordinarily allow defense counsel to make copies of photographs or other documentary evidence, the most defense counsel could do in this case was inspect

them due to the contraband nature of the unsanitized photos, as defense counsel acknowledged. And while it might be true that the State was not restricted from providing the defense with copies of sanitized photos, defense counsel has not cited a rule or governing legal principle that establishes any sort of a discovery violation, obviating the need for us to address Cadotte's insufficient-remedy argument.

[¶38.] But even if there had been a discovery violation, the appellate record would not allow us to assess its effect. In fact, there is a real question as to which images are even at issue on appeal. Defense counsel made several references to having been given four sanitized images before trial, but counsel did not clarify whether those four images were different from any of the five sanitized photos that were admitted during Tina's trial testimony. In theory, defense counsel could have been provided with all but one of the sanitized photos before trial.

[¶39.] But regardless, the sanitized images are simply redacted or censored versions of the unsanitized photos that defense counsel had viewed in preparation for trial. Indeed, it was the nine unsanitized photos—not the five sanitized ones— that depicted the actual rape offenses, and corresponded numerically to the nine guilty verdicts, and—significantly—were admitted without objection.

### *Hearsay*

[¶40.] "Hearsay is a statement that: '(1) The declarant does not make while testifying at the current trial or hearing; and (2) A party offers in evidence to prove the truth of the matter asserted in the statement.'" *State v. Osman*, 2024 S.D. 15, ¶ 38, 4 N.W.3d 558, 570 (quoting SDCL 19-19-801(c)). A "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person

intended it as an assertion." SDCL 19-19-801(a). A "'Declarant' means the person who made the statement." SDCL 19-19-801(b).

[¶41.] In its more traditional formulation, hearsay is an out of court statement offered to prove the truth of the matter asserted. Generally speaking, hearsay is not admissible at trial unless provided otherwise by statute, the South Dakota Rules of Evidence, or "[o]ther rules prescribed by the Supreme Court." SDCL 19-19-802. "We review evidentiary rulings under our abuse of discretion standard." *Osman*, 2024 S.D. 15, ¶ 35, 4 N.W.3d at 569 (citing *State v. Malcolm*, 2023 S.D. 6, ¶ 31, 985 N.W.2d 732, 740). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *State v. Huante*, 2026 S.D. 6, ¶ 30, 31 N.W.3d 715, 725 (quoting *State v. Pretty Weasel*, 2023 S.D. 41, ¶ 28, 994 N.W.2d 435, 441).

[¶42.] Cadotte contends that the State elicited inadmissible hearsay when it asked Detective Walker whether "Tina [was] able to identify photos that she believed [A.R.] was present in," and Detective Walker responded, "Yes, ma'am." The State, on the other hand, argues that Detective Walker's response cannot constitute hearsay because it was not being offered for the truth of the matter asserted. In the State's view, Detective Walker "was testifying to his methods in conducting his investigation."

[¶43.] We question whether Detective Walker's response—"Yes, ma'am"— even qualifies as an out of court statement by a nontestifying declarant. But we need not resolve the discrete hearsay issue in this case because even if Detective

Walker's response was inadmissible hearsay, the erroneous admission of hearsay statements does not necessarily require reversal. *See Osman*, 2024 S.D. 15, ¶ 35, 4 N.W.3d at 569. To establish reversible error, "a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." *Id.* (quoting *State v. Little Long*, 2021 S.D. 38, ¶ 49, 962 N.W.2d 237, 255). "Prejudice exists when there is 'a reasonable probability that, but for [the error], the result of the proceeding would have been different.'" *State v. Bordeaux*, 2025 S.D. 55, ¶ 59, 27 N.W.3d 45, 59 (alteration in original) (quoting *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686).

[¶44.] And here, Cadotte cannot show prejudice because Detective Walker's testimony on this point was cumulative to Tina's testimony. "Where inadmissible evidence admitted at trial is cumulative only and other admissible evidence supports the result, the cumulative evidence, though inadmissible, is nonprejudicial." *State v. Shepard*, 2009 S.D. 50, ¶ 16, 768 N.W.2d 162, 167 (quoting *State v. Tribitt*, 327 N.W.2d 132, 135 (S.D. 1982)). Tina testified before Detective Walker, and the State had already asked whether she identified A.R. in any of the photos he had shown her:

> **Question:** Now, do you recall being interviewed by Detective Walker in this matter? Do you recall being interviewed by a detective in this matter?
>
> **Answer:** Yes.
>
> **Question:** And during that interview were you shown photographs?
>
> **Answer:** I was.

> **Question:** And what was your understanding of why you were being shown those photographs?
>
> **Answer:** To identify [A.R.].
>
> . . .
>
> **Question:** And during being shown those photographs, were there some that you could not identify as A.R.?
>
> **Answer:** Yes.
>
> **Question:** And were there photographs where you believed that that was A.R. in those photos?
>
> **Answer:** Yes.

[¶45.] Because the testimony Cadotte objected to as hearsay was cumulative to testimony Tina had already given, Cadotte is unable to show prejudice.

## Conclusion

[¶46.] In the absence of any discovery violation, the circuit court did not abuse its discretion when it denied defense counsel's motion to exclude the sanitized photos from being admitted at trial. Moreover, regardless of whether Detective Walker's response constituted inadmissible hearsay, Cadotte cannot show that its admission prejudiced the outcome of his jury trial because it was cumulative to Tina's testimony.

[¶47.] JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, and RANK, Circuit Court Judge, concur.

[¶48.] RANK, Circuit Court Judge, sitting for GUSINSKY, Justice, who deemed himself disqualified and did not participate.